**UNITED STATES of America,**

v.

**UNION GAS COMPANY,**

v.

**COMMONWEALTH OF PENNSYLVANIA and the Borough of Stroudsburg.**

**Appeal of UNION GAS COMPANY.**

No. 85–1177.

United States Court of Appeals, Third Circuit.

Argued Jan. 7, 1986.

Decided June 10, 1986.

David H. Marion (Argued), Robert A. Swift, Kohn, Savett, Marion & Graf, Philadelphia, Pa., Lawrence A. Demase, Benjamin F. Wilson, Rose, Schmidt, Chapman, Duff & Hasley, Pittsburgh, Pa., for appellant.

Leroy S. Zimmerman, Atty. Gen., Maura A. Johnston, Deputy Atty. Gen., Andrew S. Gordon, Sr. Deputy Atty. Gen., Allen C. Warshaw (Argued), Chief Deputy Atty. Gen., Harrisburg, Pa., for appellee.

Before: WEIS, HIGGINBOTHAM, BECKER, Circuit Judges.

### OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal presents a single question: whether the eleventh amendment bars defendant-third party plaintiff Union Gas Company from suing the state of Pennsylvania for monetary damages in an action arising under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, or Superfund), 42 U.S.C. § 9601 *et seq.* (1982). The district court held that the eleventh amendment was a bar to suit and dismissed Union Gas' claim against the state. We affirm.

### I. THE FACTS

The relevant facts can be summarized quite briefly. Predecessors of Union Gas Company owned and operated a carburetted water gas plant proximate to Brodhead Creek in Stroudsburg, Pennsylvania, between 1890 and 1948, after which the plant was dismantled. In 1953 and 1970, Union Gas sold part of its land near the creek to Pennsylvania Power and Light Company, which in turn granted easements over the land to the Borough of Stroudsburg. In 1955, due to flooding, the state and the borough, together with the Army Corps of Engineers, dug levees, erected dikes, narrowed and deepened the creek, and redirected its flow. In early 1980, the borough assigned its easements to the state.

On October 7, 1980, the state was excavating at the creek when it struck a large deposit of coal tar that began to seep into Brodhead Creek. Alerted to the coal tar seepage, the Environmental Protection Agency (EPA) asserted that the coal tar was a hazardous substance and ordered the site be cleaned up.[1] The state of Pennsylvania jointly with the federal government undertook, *inter alia*, to dredge the back channel of Brodhead Creek, to install a slurry wall to prevent further coal tar seepage, and to clean up the coal tar that had already seeped into the water. The federal government reimbursed the state for all its costs, expending approximately $720,000 in total.

### II. INSTITUTION OF THIS SUIT

The United States brought suit in the district court for the Eastern District of Pennsylvania against Union Gas under CERCLA §§ 104, 107 (42 U.S.C. §§ 9604,

---

**1.** Brodhead Creek thus had the dubious distinction of being the first Superfund site in the nation.

9607) for recoupment of costs of $450,000 incurred in cleaning up the spill at Brodhead Creek.[2] The United States claimed that the coal tar had been deposited into the ground near Brodhead Creek by Union Gas and its predecessors as a by-product of their carburetted water gas processing, and that Union Gas was consequently liable for the clean up costs. Union Gas answered the complaint, denying any liability, and filed a third-party complaint pursuant to Fed.R.Civ.P. 14, naming Pennsylvania and the Borough of Stroudsburg as third-party defendants. Union Gas alleged that the state and its political subdivision had "negligently caused, or contributed to, the discharge of coal tar into Brodhead Creek" by their recent excavation and earlier construction of dikes and levees, and therefore that they should pay for the clean up.

■ The state, believing that the eleventh amendment barred Union Gas' suit against it, responded with motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6).[3] The district court granted the state's motion. *United States v. Union Gas Co.*, 575 F.Supp. 949 (E.D.Pa.1983). Shortly thereafter, the United States filed an amended complaint, virtually identical to its original complaint but with revised damage figures alleging that the United States had spent $1,400,000 on the clean-up, of which $720,000 was collectible from Union Gas under CERCLA. Union Gas answered and filed an amended third-party claim against the state and borough. The state again moved to dismiss, and the court granted the state's motion "for the reasons set forth in [575 F.Supp. 949]."

Approximately five months after the court's dismissal of Union Gas' amended third-party claim, the court dismissed the federal government's action against Union Gas pursuant to Rule 23(b) of the Local Rules of Civil Procedure of the Eastern District of Pennsylvania on the understanding that the United States and Union Gas had reached a settlement. Union Gas then appealed, citing as error the district court's denial of its motion to join the state as a party.

The issue before us involves a question of law, and therefore our review is plenary.

### III. *ABROGATION OF ELEVENTH AMENDMENT IMMUNITY*

■ The eleventh amendment states that:

> The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. Although not apparent on its face, the eleventh amendment has been interpreted as a grant of sovereign immunity to the states in federal court.[4] *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). *But see Green v. Mansour*, —— U.S. ——, 106 S.Ct. 423, 431, 88 L.Ed.2d 371 (1985) (Brennan, J., dissenting) ("the Amendment was intended simply to remove federal court jurisdiction over suits against a State where the basis for jurisdiction was that the plain-

**2.** The United States also sought damages of $270,000 under the Federal Water Pollution Control Act, 33 U.S.C. §§ 1321(b)(3) and (f)(2) (1982). Union Gas did not file a third-party claim with respect to these damages, however, and so they are irrelevant to this appeal.

**3.** Independent local political subdivisions are generally not entitled to immunity, although they may, in some circumstances, be considered arms of the state and thus derive the state's eleventh amendment immunity. *See Laje v. R.E. Thomason General Hospital*, 665 F.2d 724,

727 (5th Cir.1982). Because Stroudsburg did not raise an eleventh amendment defense below, and did not appear on this appeal, we reach no decision as to whether the eleventh amendment immunity would extend to Stroudsburg.

**4.** The amendment does not speak about the amenability of states to suits in state court. When we speak in this opinion of "states' sovereign immunity," we refer only to their immunity from suit in federal court derived from the eleventh amendment.

tiff was a citizen of another State or an alien"); *Atascadero State Hospital v. Scanlon,* — U.S. ——, 105 S.Ct. 3142, 3156–78, 87 L.Ed.2d 171 (1985) (Brennan, J., dissenting) (detailing history of the amendment to support the same conclusion); Gibbons, *The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation,* 83 Colum.L.Rev. 1889 (1983) (same); Shapiro, *Wrong Turns: The Eleventh Amendment and the* Pennhurst *Case,* 98 Harv.L.Rev. 61, 67–71 (1984). The immunity can be avoided in only two ways: (a) Congress can *abrogate* it by providing through statute for suits against states, or (b) states can *waive* their sovereign immunity and consent to be sued. We are concerned here only with whether CERCLA abrogated Pennsylvania's immunity.[5]

The Supreme Court has noted the eleventh amendment's importance in maintaining the balance of power between state and federal interests. *See, e.g., Atascadero, supra,* 105 S.Ct. at 3147–48; *Pennhurst, supra,* 465 U.S. at 99, 104 S.Ct. at 907. Because this balance is central to our system of federalism, the Court has been reluctant to infer abrogation of the eleventh amendment by a federal statute that could

be otherwise interpreted. In *Pennhurst,* for example, the Court required "an unequivocal expression of congressional intent to 'overturn the constitutionally guaranteed immunity of the several States.'" 465 U.S. at 99, 104 S.Ct. at 907 (*quoting Quern v. Jordan,* 440 U.S. 332, 342, 99 S.Ct. 1139, 1146, 59 L.Ed.2d 358 (1979)). In the recent *Atascadero* case, the Court held that "Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself." 105 S.Ct. at 3148 (footnote omitted). *See also Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

▮ Even a statute whose natural reading would allow for suits against the state—indeed a statute for which any other reading may be awkward—may not suffice. The Court has insisted that the statute, when read literally, not merely allow suits against the state, but that it do so with such specificity that it is clear that Congress consciously and directly focused on the issue of state sovereign immunity and chose to abrogate it.[6] *Cf. Hutto v. Finney,* 437 U.S. 678, 706, 98 S.Ct. 2565, 2581, 57 L.Ed.2d 522 (1978) (Powell, J., concurring in part and dissenting in part) ("The Court

5. Union Gas also claims that Pennsylvania waived its immunity, but this claim is patently without merit and the district court did not even consider it. *United States v. Union Gas, supra,* 575 F.Supp. at 950. Union Gas alleges that Pennsylvania consented to suit by (a) owning and operating a site where hazardous wastes were stored, and (b) participating with the federal government in the clean-up effort. Leaving aside the fact that Pennsylvania most likely did not know of the coal tar in the bed of Brodhead Creek and so cannot be said to have consented to anything by its purchases of property, Pennsylvania's purchase and clean-up efforts are not sufficiently emphatic to constitute a constructive waiver of its constitutional right. It would be unreasonable to infer from Pennsylvania's actions that it had waived one of its most important and longstanding constitutional rights. *Cf. Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974) ("Constructive consent is not a doctrine commonly associated with the surrender of constitutional rights, and we see no place for it here."); *Great Northern Life Insurance Co. v. Read,* 322 U.S. 47, 54, 64 S.Ct. 873, 876, 88 L.Ed. 1121 (1944); *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909). *See generally*

Tribe, *Intergovernmental Immunities in Litigation, Taxation, and Regulation: Separation of Powers Issues in Controversies About Federalism,* 89 Harv.L.Rev. 682, 695 (1976) (suggesting that courts require a definitive action by states before finding waiver of sovereign immunity).

Moreover, there is a bootstrap quality to Union Gas' argument that merely by aiding in the clean-up effort Pennsylvania waived its immunity. Stripped to its essence, Union Gas is arguing that waiver is a condition precedent to participation in the clean-up. But because participation is expressly allowed by statute, 42 U.S.C. § 9604(d)(1), the imposition of the condition must be found in CERCLA itself. Thus, Union Gas' waiver argument depends upon its interpretation of CERCLA—*i.e.,* it is an argument of abrogation, not waiver. As such the argument is superfluous, for if the abrogation argument works, then the waiver argument is irrelevant, and if the abrogation argument fails, then so does the waiver argument.

6. Because abrogation requires a showing of "plain intent" rather than merely "plain meaning," the dissent's focus on CERCLA's "plain meaning" misses the mark.

should be 'hesitant to presume congressional awareness' of Eleventh Amendment consequences of a statute that does not make express provision for monetary recovery against the States.") (*quoting SEC v. Sloan*, 436 U.S. 103, 121, 98 S.Ct. 1702, 1713, 56 L.Ed.2d 148 (1978)).[7]

Two cases in particular illustrate the Court's insistence on overwhelming evidence of congressional intent. In *Employees of Dept. of Pub. Health & Welfare v. Missouri Dept. of Pub. Health & Welfare*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1972), employees of a state hospital sued for overtime pay that they claimed they were entitled to under the Fair Labor Standards Act (FLSA). One section of the FLSA gave employees whose employers were covered by the FLSA a right of action against the employers to enforce the FLSA's terms. Another section had recently been amended explicitly to include state hospitals in the class of employers regulated by the FLSA. Although these two sections appeared to allow for a suit against state governments in federal court, the Court found no abrogation of the State's immunity because there was no evidence of congressional intent on the specific issue of sovereign immunity. *Id.* at 284–85, 93 S.Ct. at 1617–18. It was also significant, the Court noted, that there was a plausible interpretation of the amended section that did not require abrogation of the eleventh amendment, according to which the section empowered the Secretary of Labor to sue the state on the workers' behalf. *Id.* at 285–86, 93 S.Ct. at 1618.

The second illustrative case, *Atascadero, supra*, involved § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1982), which conferred a right of action upon handicapped people who were discriminated against by "any recipient of federal assistance." A plaintiff sought damages from a state hospital that received federal financial assistance, but the Court held that the inclusive language of the Rehabilitation Act notwithstanding, the eleventh amendment barred the suit:

> The statute thus provides remedies for violations of § 504 by "*any* recipient of federal assistance." There is no claim here that the State of California is not a recipient of federal aid under the statute. But given their constitutional role, the States are not like any other class of recipients of federal aid. *A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment. When Congress chooses to subject the States to federal jurisdiction, it must do so specifically.*

105 S.Ct. at 3149 (emphasis added) (footnote omitted).

One other case deserves special mention. In *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the Supreme Court held that the Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988 (1982), abrogated the eleventh amendment, thus permitting successful claimants against the state to receive attorneys' fees, even though the relevant statutory language was quite general and referred to neither the eleventh amendment nor suits against states. The Court relied on several factors, most significantly § 1988's extensive legislative history. The Court observed that both the House and Senate Reports explicitly endorsed the payment of attorneys' fees by states,[8] *see Hutto*, 437 U.S. at 694, 98 S.Ct. at 2575, and that two attempts to amend the Act to immunize state and local governments from awards had been defeated. *Id.* The Court concluded that this evidence provided the req-

---

**7.** Justice Powell wrote for the majority in *Atascadero*, discussed *infra*.

**8.** The Senate Report said that "[i]t is intended that the attorneys' fees, like other items of costs, will be collected either directly from the official, ... or from the State." S.Rep. No. 94–1011, p. 5 (1976) (footnotes omitted), [1976] U.S.CODE CONG. & AD.NEWS 5908, 5913 (quot-

ed in *Hutto*, 437 U.S. at 694, 98 S.Ct. at 2575). The House Report was even more direct: "Of course, the 11th Amendment is not a bar to the awarding of counsel fees against state governments." H.R.Rep. No. 94–1558, p. 7 n. 14 (1976) (quoted in *Hutto*, 437 U.S. at 694, 98 S.Ct. at 2575).

uisite "formal indication of Congress[ional] intent to abrogate States' Eleventh Amendment immunity," *id.* at 697 n. 27, 98 S.Ct. at 2577 n. 27, and that it would be irresponsible to refuse to read § 1988 as an abrogation of immunity, *id.* at 694, 98 S.Ct. at 2575. The Court was further influenced by the fact that because § 1988 "primarily applies to laws passed specifically to restrain state action," allowing the eleventh amendment to bar § 1988 suits would rob § 1988 of much of its force. *Id.* at 693–94, 98 S.Ct. at 2574–75. Finally, the Court noted the special nature of attorney's fees as costs of litigation, and thus within the traditional power and discretion of the judiciary. *Id.* at 696, 98 S.Ct. at 2576; *id.* at 697 n. 27, 98 S.Ct. at 2577 n. 27.

■ There is some question whether *Hutto* stands in the wake of *Atascadero's* explicit holding that "unmistakable language in the statute itself" is the *sine qua non* of abrogation. The *Atascadero* Court did not overturn *Hutto*, however, and so we believe that it retains its precedential value. *Hutto* demonstrates that although

a court may interpret a statute to abrogate states' eleventh amendment immunity even in the absence of explicit statutory language to that effect, the evidence in favor of such an interpretation must be virtually overwhelming. This insistence on overwhelming evidence is only intensified by *Atascadero.*[9]

This brief review provides the background for our consideration of whether CERCLA may be interpreted to abrogate the eleventh amendment.

## IV. *CERCLA AND THE ELEVENTH AMENDMENT*

CERCLA, Pub.L. No. 96–510, 94 Stat. 2767 (codified in 42 U.S.C. §§ 9601–15, 9631–33, 9641, 9651–53, 9654–56, 6911–11A, 9657, and various sections of titles 26, 33 and 49), was a bold effort to meet the threat to the public health and environment posed by inactive hazardous waste sites. *See* H.R.Rep. No. 1016, PT. I, 96th Cong., 2d Sess. (1980), *reprinted in* [1980] U.S. Code Cong. & Ad.News 6119; S.Rep. No. 848, 96th Cong., 2d Sess. (1980).[10] We shall not canvass the full scope of that

---

**9.** In *Parden v. Terminal Ry. Co.,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), the Supreme Court held that a state that ran a railroad for profit was liable to its employees under the Federal Employers' Liability Act although that act had no mention of the eleventh amendment and its legislative history was sparse. *Parden* would thus seem to imply a lesser standard of proof for abrogation than that required by *Hutto,* and Union Gas relies upon it. The reliance is misplaced, for *Parden* has been limited to instances in which the state is engaged in a for-profit enterprise. *See Employees, supra,* 411 U.S. at 285, 93 S.Ct. 1618. Union Gas has not suggested that Pennsylvania was engaged in such an enterprise here, and therefore *Parden* would appear to be inapposite.

Moreover, as Professor Tribe noted in 1976, the philosophy underlying *Parden* shifted significantly in the years following it, making abrogation more difficult:

In the decade between *Parden* and *Edelman [v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)], the Supreme Court's stance on the eleventh amendment has significantly shifted. *Parden* would make states amenable to suit in federal court whenever they undertake an activity for which a private person could potentially be held liable under a valid federal law. The *Parden* majority thus posited no distinction between the states and

other entities that might be regulated by federal legislation. *Employees* and *Edelman,* on the other hand, understand states to be distinguished from other entities by federalism considerations. For this reason, the amenability of states to suit must be specifically addressed by federal legislation, and Congress must make its intention to treat states like private parties unmistakably clear. This policy of clear statement had been rejected by the *Parden* majority, but ... eventually prevailed. Tribe, *supra,* at 690–91 (footnotes omitted). *See also Welch v. State Dept. of Highways & Pub. Trans.,* 780 F.2d 1268, 1270–73 (5th Cir.1986) *(en banc)* (discussing developments in the jurisprudence since *Parden).* The years since Professor Tribe wrote have only confirmed and deepened the change in attitude that he identified.

**10.** The legislative history of CERCLA is exceedingly complicated because of the manner in which the bill was passed. Three bills in the Ninety-Sixth Congress contributed in some way to the legislation as finally enacted, H.R. 7020, 96th Cong., 2d Sess. (1980), H.R. 85, 96th Cong., 1st Sess. (1979), and S. 1480, 96th Cong., 1st Sess. (1979). The legislative history is untangled and analyzed in Grad, *A Legislative History of the Comprehensive Environmental Response, Compensation and Liability ("Superfund") Act of 1980,* 8 Colum.J.Env.L. 1 (1982).

effort; we shall instead review those provisions of CERCLA that are directly relevant to Union Gas' claim that CERCLA manifests Congress' intent to abrogate states' eleventh amendment immunity.

A. *42 U.S.C. § 9607 and the Definition of "Person"*

CERCLA empowers the President, in coordination with the state or states in which there is a hazardous waste site emergency, to clean up the dangerous waste or take other steps necessary to prevent the danger from escalating. 42 U.S.C. § 9604. The liability section of CERCLA, 42 U.S.C. § 9607(a), allows those who have incurred clean-up costs to sue "any person" who owned or operated the waste site for all costs incurred in the removal effort. The definitional section of the statute, 42 U.S.C. § 9601, defines person as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, *State*, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(21) (emphasis added).

Union Gas argues that 42 U.S.C. §§ 9607(a) and 9601 jointly meet the clear statement requirement enunciated by the Supreme Court. The argument is straightforward: (1) § 9607(a) says that any person who owns or operates a hazardous waste site is liable for clean-up costs; (2) the state owns the land on Brodhead Creek where the hazardous waste is deposited; (3) § 9601 says that a state is a person for purposes of CERCLA; therefore, (4) the state is jointly liable for the costs of the clean-up.

■ Although this argument is not without force, we cannot accept it. The statutory arrangement in this case is almost identical to that in *Employees of Dept. of Pub. Health & Welfare v. Missouri Dept. of Pub. Health & Welfare,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1972). Here, as there, the suggestion that states might be sued is found in a provision separate from the one that creates the plaintiff's cause of action. The *Employees* Court found that arrangement insufficient to satisfy the burden of abrogation. Because there is no suggestion in CERCLA's legislative history that the authors of these provisions intended them to make states liable for damages, *cf. Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), we are bound by *Employees* to find that the inclusion of "states" within the class of potential defendants is insufficient to abrogate Pennsylvania's immunity.[11]

■ We would reach the same conclusion without the guidance of *Employees,* for there is evidence in CERCLA itself that § 9607(a) was not intended to abrogate states' sovereign immunity. The United States is included in the definition of person in § 9601(21); therefore, if § 9607(a) were indeed an abrogation of states' sovereign immunity then that section would waive the United States' immunity as well. However, a separate CERCLA provision, § 9607(g) explicitly waives federal sovereign immunity.[12] This implies that § 9607(a) does not waive federal immunity, for otherwise § 9607(g) would be superfluous. *See* 2A Sutherland Stat. Const. § 46.06 (4th ed. 1984 rev.) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inopera-

11. The dissent suggests that the "key distinction" between *Employees* and this case is that the inclusive language in the FLSA at issue in *Employees* was an amendment to the statute while there was no such "evolution" in CERCLA. Dissent Op. at 384–85. A fair reading of *Employees* demonstrates, however, that it was not the fact that the statute had been amended that led the Court to its conclusion, but rather the absence of any clear indication of congressional intent to abrogate states' eleventh amendment immunity. *See Employees,* 411 U.S. at 283–85, 93 S.Ct. at 1617–18. There is no greater evidence of congressional intent in this case.

12. 42 U.S.C. § 9607(g) states:
 Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under this section.

tive or superfluous ...". Since § 9607(a) treats states and the federal government identically—and since abrogation of states' eleventh amendment immunity requires no less a showing of congressional intent than does waiver of federal sovereign immunity [13]—it follows that § 9706(a) does not abrogate states' eleventh amendment immunity, either.

 Even if not read as an abrogation of state sovereign immunity, § 9607(a) still performs a meaningful function, *cf. Hutto*, 437 U.S. at 693–94, 98 S.Ct. at 2574–75, because it establishes a right of action *by the United States* against any states that own or operate hazardous waste sites. Suits by the United States against states are not foreclosed by the eleventh amendment, *United States v. Mississippi*, 380 U.S. 128, 140–41, 85 S.Ct. 808, 814–15, 13 L.Ed.2d 717 (1965), but without § 9607(a) the United States would not be able to sue the states under CERCLA's generous terms.[14] Since the United States does most of the initial clean-up and then sues for reimbursement, our reading leaves § 9607(a) with substantial importance.

### B. *Section 9607(e)(2) and Subrogation Rights*

Section 9607(e)(2) states that "[n]othing in this subchapter ... shall bar a cause of action that ... any ... person subject to liability under this section ... has or would have, by reason of subrogation." Union Gas argues that this section allows it to subrogate to the rights of the United States against Pennsylvania once the United States settled its case against Union Gas. Since the United States could sue Pennsylvania, *see supra* Part IV.A, Union Gas argues, so should Union Gas be able to do so, through the device of subrogation. .

Section 9607(e)(2) simply cannot bear the burden it must to abrogate the states' eleventh amendment sovereign immunity. That section does not even mention the eleventh amendment or suits against states. There is no evidence in the legislative history of § 9607(e)(2) that Congress intended private parties to inherit all of the rights of the United States including the right to override the states' right not to be sued by private citizens in federal court, and we cannot ascribe such an intention to Congress.[15] Once again, if our refusal to read § 9607(e)(2) as an abrogation provision rendered that section meaningless or contradictory, we would have to reconsider our position. But our holding that § 9607(e)(2) does not allow private parties to sue states leaves it open for private parties to sue other private parties or the United States in the appropriate circumstances. Thus, under our reading, § 9607(e)(2) retains a significant role.

### C. *CERCLA's Broad Policy*

CERCLA was intended "to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with ... hazardous waste disposal sites." H.R.Rep.

---

**13.** Arguably, abrogation of states' eleventh amendment immunity would require a greater showing of congressional intent than does waiver of federal sovereign immunity. The difference in the burdens of proof would arise from the fact that federal sovereign immunity, unlike states' eleventh amendment immunity, arises from the common law not the Constitution. *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 5 L.Ed. 257 (1821); Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv.L.Rev. 1 (1963) (tracing origins of doctrine in old English cases). We might therefore require greater specificity for the abrogation of state sovereign immunity than for the waiver of federal immunity. However, as that particular question is not before us here, the observations in this footnote are not part of our holding.

**14.** Most significantly, CERCLA allows for full recoupment of clean-up costs and strict liability. 42 U.S.C. § 9607(a), (c). If the United States could not sue states under CERCLA, it might be left to sue each state under its own tort law.

**15.** Union Gas cites only one case to support the proposition that a party that subrogates to the rights of the United States inherits the right to sue states, *Prairie State National Bank v. United States*, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896). That case did not contain any constitutional issues, let alone the particular issue of eleventh amendment sovereign immunity. No state was even a party in that case.

No. 1016, 96th Cong., 2d Sess. 22, *reprinted in* [1980] U.S. CODE CONG. & AD. NEWS 6119, 6125. Fastening on the word "comprehensive" in this passage and on similar expressions elsewhere of Congress' resolve to deal with hazardous waste sites with one fell swoop, *see, e.g.,* S.Rep. No. 848, 96th Cong., 1st Sess. 12 (1980) (bill "is designed to help address many of the problems faced by society as a result of chemical contamination."), Union Gas argues that Congress must have intended to abrogate states' immunity or else CERCLA would be less than "comprehensive" and all-encompassing. The inevitable conclusion, the argument runs, is that CERCLA must be an abrogation of states' eleventh amendment immunity.

 While the previous two arguments relied on the language of CERCLA itself, this one relies exclusively on CERCLA's legislative history. It therefore faces a particularly heavy burden that it is unable to bear. Not only is there nowhere near the overwhelming evidence relied upon by the Supreme Court in *Hutto v. Finney,* 437 U.S. at 694, 98 S.Ct. at 2575, but there is simply no indication *anywhere* in CERCLA's legislative history that Congress considered abrogating the eleventh amendment or even contemplated CERCLA suits against states.[16] The declaration that a bill will deal "comprehensively" with a problem is commonplace and may be little more than political hyperbole; at all events, it does not rise to the level necessary to deprive states of their constitutional rights. The legislative history falls far short of providing a "formal indication of Congress' intent to abrogate the States' Eleventh Amendment immunity," *id.* at 697 n. 27, 98

S.Ct. at 2577 n. 27, and Union Gas' argument from legislative history thus fails.

### D. *A Comparison of CERCLA with other Environmental Statutes*

CERCLA was not the first congressional effort to deal with environmental problems by creating causes of action against polluters. The Clean Air Act, the Resource Conservation and Recovery Act (RCRA), and the Federal Water Pollution Control Act all authorize citizens' suits against polluters. In each case, the legislation specifically provides that any citizen may sue violators of the relevant statute to enforce the terms of the act and that if the violators are states they may be sued "to the extent permitted by the Eleventh Amendment to the Constitution." *See* 42 U.S.C. § 7604 (1982) (Clean Air Act); 42 U.S.C. § 6972 (1982) (RCRA); 33 U.S.C. § 1365 (1982) (Federal Water Pollution Control Act).

Because CERCLA does not have an analogous provision for citizens' suits,[17] § 9607, which limits standing to those who have incurred response or remedial expenses in cleaning up releases of hazardous substances, is the closest analogy in CERCLA to the citizens' suit provisions of the other statutes. Union Gas points out that unlike those provisions in the other statutes, CERCLA does not have an explicit eleventh amendment limitation and concludes that the absence of such a limitation in CERCLA is sufficient evidence that Congress intended CERCLA to abrogate the eleventh amendment.

 Our answer, by now familiar, but no less applicable or correct, is that this

---

**16.** The issue of states' immunity was never squarely addressed by either house of Congress in the CERCLA debates. The eleventh amendment was mentioned not once in any document or discussion pertaining to CERCLA. It can be argued that the Senate debates suggest that to the extent there was any consideration of the matter of sovereign immunity, it was though that states would retain their immunity. Senator Randolph, for example, stated that the purpose of CERCLA liability provisions was to "provide that the funds be financed largely by those industries and consumers who profit from prod-

ucts and services associated with the hazardous substances which impose risks on society." 126 Cong.Rec. 30932 (Nov. 24, 1980). This statement would not appear to include states. However, this argument is not necessary to our conclusion, and we note it only in the interests of completeness.

**17.** There are bills currently in Congress that would amend CERCLA to allow for citizen suits. The bills are discussed *infra* at p. 383.

evidence is simply insufficient to overcome the states' constitutional right to immunity. In the first place, the citizen suit provisions in the other three statutes are fundamentally different from § 9607, for whereas those provisions permit only injunctive relief to enforce the terms of each statute, § 9607 permits recoupment of clean-up expenses, an action for damages. Thus, the analogy is inexact. More fundamentally, even if the citizen suit provisions allowed for damage remedies as does § 9607, we do not believe that the comparison between the statutes would constitute a showing of congressional intent sufficient to abrogate eleventh amendment immunity. None of the Supreme Court cases cited above, nor any other case of which we are aware in any court, has read a statute to abrogate eleventh amendment immunity on the basis of what the statute did *not* say. Congressional silence, except in the rarest of cases, is not unequivocal evidence of congressional intent. To interpret congressional silence as express abrogation, therefore, would be improper. *See Employees, supra,* 411 U.S. at 285, 93 S.Ct. at 1618 ("It is not easy to infer that Congress ... desired silently to deprive the States of an immunity they have long enjoyed....").

Our position is unchanged by recently proposed amendments to CERCLA that would provide for citizen suits. Both the House and the Senate have passed bills amending CERCLA in various respects. *See* H.R. 2817, 99th Cong., 1st Sess. (1985) (House Bill); H.R. 2005 (Senate Bill). The bills are scheduled for joint conference, and are not yet law. Among the amendments are ones analogous to the citizen suit provisions in the Clean Air Act, Federal Water Pollution Act, and RCRA, that allow citizens to bring suits against any violators of CERCLA, or against the President, to enforce compliance with CERCLA. Like those other provisions, the proposed CERCLA citizen suit provision would permit suits against states "to the extent permitted by the Eleventh Amendment." See H.R. 2817 § 150; H.R. 2005 § 310. Union Gas argues that the facts that the proposed amendments would include the eleventh amendment limitation and that § 9607 does not include it imply that § 9607 was intended to abrogate the eleventh amendment.[18]

Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in judicial statutory interpretation. *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969). There is no evidence, however, to support Union Gas' contention that the proposed amendments are a response to the terms or perceived meaning of § 9607. Union Gas points to no legislative history of the proposed amendments that suggests that the Congress considering the amendments thought that § 9607 abrogated the eleventh amendment and made a conscious decision to distinguish the amendments by limiting the scope of the citizens' suits. Our independent review of the legislative history has also turned up no evidence that the proposed amendments reflect the current Congress' judgment about the scope and meaning of § 9607. Without any such evidence, the amendments cannot withstand the burden of proof that abrogation demands.[19]

---

18. Union Gas explains: "[I]f [the proposed amendments] were to become law, it would suggest that Congress had abrogated and intended to continue the abrogation of states' Eleventh Amendment immunity as to [42 U.S.C. § 9607] suits brought by parties that have paid clean-up costs, but not as to the new categories of citizen suits."

19. There is a perfectly reasonable explanation for the eleventh amendment limitations in the proposed citizen suit provisions according to which those limitations are not a response to the scope of § 9607: it may be simply that the proposed CERCLA citizen suit provisions were modeled after the analogous provisions in the other environmental statutes, without regard to § 9607.

On account of the lack of evidence that the proposed amendments are a response to the current Congress' understanding of § 9607, we do not have to decide how much weight we would give the amendments if they were in fact motivated by a current legislative interpretation of § 9607. Because the proposed amendments are not yet, and may never be, law, the amendments deserve less weight than they would oth-

## V. CONCLUSION

We hold that CERCLA does not evidence congressional intent to abrogate states' eleventh amendment immunity. The judgment of the district court will be affirmed.

A. LEON HIGGINBOTHAM, JR., Circuit Judge, dissenting.

When a statute in its definitional section declares unequivocally that the term "person" includes a *"State*, municipality, commission, political subdivision of a *State*, or any interstate body" 42 U.S.C. § 9601(21) (emphasis added), the explicit language of Congress should not be disregarded where there is no legislative history suggesting that Congress did not mean what they said when they used the word "state." Instead of giving Congress the presumption that they know what a state is, the majority seems to assume that judges have a better mastery and understanding of the English language than does Congress, and thus they roam through inconclusive legislative history to "demonstrate" that Congress did not mean state when they included that specific phrase in the key definitional section of the statute. In the future, to comply with the rationale of the majority, in definitional sections of similar statutes where remedies are provided for damages citizens or corporations have suffered, Congress must use language similar to the following: "The term person includes a state, and we really mean the state, and furthermore the eleventh amendment's prohibition on suits against the states does not apply." In matters of statutory construction of legislation that is as explicit as the statute in issue, no other court has imposed as broad a reading of eleventh amendment prohibitions. I respectfully dissent.

### I.

The liability section of Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607, provides that "... *any person* who

at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, ... *shall be liable for ... any other necessary costs of response incurred by any other person* consistent with the national contingency plan...." 42 U.S.C. § 9607(a)(4)(B) (emphasis added). The definitional section of the statute, 42 U.S.C. § 9601, defines person as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, *State*, municipality, commission, political subdivision of a *State*, or any interstate body." 42 U.S.C. § 9601(21) (emphasis added). Inasmuch as the plain language of 42 U.S.C. §§ 9607(a)(4)(B) and 9601(21), when read jointly, declares that a state is a person for liability purposes pursuant to CERCLA, it follows then that "states" are within the class of potential defendants liable for the costs of the clean-up. The statutory language points unambiguously to a conclusion contrary to that reached by the majority. To reach the conclusion that the word state means state one need not resort to inferences or *a fortiori* reasoning. One need not fill in what Justice Cardozo calls the "interstitial gaps" of legislation. Nor are we confronted with the problem that Gray so eloquently described in his *Nature and Sources of the Law:*

> The fact is that the difficulties of so-called interpretation arise when the legislature has had no meaning at all; when the question which is raised on the statute never occurred to it; when what the judges have to do is, not to determine what the legislature did mean on a point which was present to its mind, but to guess what it would have intended on a point not present to its mind, if the point had been present.

J.C. Gray, *Nature and Sources of the Law,* § 370 at 165, *quoted in,* B. Cardozo, *The Nature of the Judicial Process* 15 (1975).

erwise. *Cf. Southeastern Community College v. Davis,* 442 U.S. 397, 411 n. 11, 99 S.Ct. 2361, 2370 n. 11, 60 L.Ed.2d 980 (1979) (statements of

legislators or congressional committees after the enactment of a law are not entitled to the same interpretive weight as subsequent legislation).

## II.

The basic issue is whether the definitional section is sufficiently adequate in itself to find legislative intent to abrogate sovereign immunity. I think it is. When interpreting a statute, the starting point is of course the language of the statute itself. *Consumer Product Safety Commission v. GTE Sylvania*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). If the language is clear and unambiguous, and there is no "clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Id.; see also Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 110, 103 S.Ct. 986, 990, 74 L.Ed.2d 845 (1983) (same).

In the instant case, there is *no* legislative history indicating that Congress considered or debated the issue of states' eleventh amendment immunity. From my view, the absence of a debate on this issue merely indicates that Congress was smart enough to know what a state is and therefore, when including states as persons who could be liable under CERCLA, Congress realized the eleventh amendment implications.

Because there is no legislative evidence as to whether Congress intended states to be inclusive or exclusive of CERCLA's liability provision, 42 U.S.C. § 9607, the language of the definitional section, 42 U.S.C. § 9601(21), is controlling and should be regarded as authoritative evidence of congressional intent to abrogate states' sovereign immunity. It would seem, therefore, from the clear words of the statute ("person means ... state, ..."), that the majority should have reached a different result. Instead, the majority held that "we are bound by [*Employees v. Missouri Dept. of Pub. Health & Welfare*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973) ] to find that the inclusion of 'states' within the class of potential defendants is insufficient to abrogate Pennsylvania's immunity." [1] Maj. at 379. I submit that since *Employees, supra*, is patently distinguishable from the case at bar, we are not "bound" to decide this case in favor of states' immunity.

In *Employees*, the employees of state health facilities brought suit against the state in federal court, seeking overtime compensation due them under the Fair Labor Standards Act ("FLSA") of 1938. The question was whether the employees could sue their state employer in federal court under FLSA. The liability section of FLSA provided in relevant part:

> Any employer who violates the provisions of section 6 or section 7 of this Act shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction....

Section 16(b) of FLSA, 52 Stat. 1069, 29 U.S.C. § 216(b) (1938). The definitional section of FLSA read in relevant part:

---

**1.** The majority also holds that "[w]e would reach the same conclusion without the guidance of *Employees*, for there is evidence in CERCLA itself that § 9607(a) was not intended to abrogate states' sovereign immunity." Maj. at 380. The majority relies on a separate CERCLA provision, § 9607(g), that explicitly waives federal sovereign immunity. The majority suggests that because § 9607(g) waives federal sovereign immunity, § 9607(a) does not waive federal sovereign immunity; hence, since § 9607(a) treats states and the federal government identically, § 9607(a) does not abrogate states' eleventh amendment immunity either. *Id.* at 380.

The majority cites no legislative history to support the weight they give to § 9607(g). At most, Congress was merely being redundant by their inclusion of a waiver of federal sovereign immunity. The redundancy is not the equivalent of demonstrating a congressional intent not to abrogate states' eleventh amendment immunity. The majority's conclusion is contrary to the familiar canon of statutory construction. Because there is no legislative history as to Congress' considering the specific problem of sovereign immunity, the court must rely on the plain language of CERCLA. The language of CERCLA contains a clear indication that Congress intended to allow private citizens to bring suits against states. In view of such clear statutory language, it does not follow that because Congress provided a specific provision abrogating federal government's immunity, Congress' failure to do the same where states are concerned evidenced a conclusive congressional intent not to lift states' sovereign immunity.

"Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee *but shall not include the United States or any State or political subdivision of a State*, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization.

Section 3(d) of FLSA, 52 Stat. 1060, 29 U.S.C. § 203(d) (1938) (emphasis added). In 1966, § 3(d) was amended by expanding the definition of employer to include a state or a political subdivision with respect to employees "(1) in a hospital, institution, or school referred to in the last sentence of subsection (r) of this section, ..." Pub.L. 89–601, § 102(b), 80 Stat. 831 (1966). In view of the 1966 amendment, FLSA seemingly subjected states to suit along with other employers. However, since the language in § 16(b) had not been changed in 1966, the court in *Employees* concluded that it should not infer that Congress had removed states' immunity from suit without amending § 16(b). The court in *Employees* said "[i]t would also be surprising in the present case to infer that Congress deprived Missouri of her constitutional immunity without changing the old section 16(b) under which she could not be sued or indicating in some way by clear language that the constitutional immunity was swept away." *Employees*, 411 U.S. at 285, 93 S.Ct. at 1618.

The key distinction between FLSA and CERCLA is that within the evolution of FLSA amendments there were two statutory provisions that caused an ambiguity as to the intent of Congress. In *Employees*, prior to 1966, there was clear statutory language indicating a congressional intent not to abrogate states' eleventh amendment immunity. But, the subsequent 1966 amendment made the earlier statutory language unclear; as to its applicability—the amended section 29 U.S.C. § 203(d) (1966) made states subject to suit under FLSA while the liability section, 29 U.S.C. § 216(b), remained the same. Read together, these sections could be rationally construed to either deny or allow states to be

subjected to suit by state employees. Thus, the evolutionary language within FLSA spawned ambiguity.

In contrast, in this case, we are not confronted with a statute which at one time declared that a person "shall not include the United States or any State or political subdivision of a State." But to the contrary, here, we have the original statute, never amended for purposes relevant to this case, that has always declared that the state was a person for liability purposes. In view of the familiar canon of statutory construction, the language of FLSA, unlike the language of CERCLA, was not authoritative evidence of clear legislative intent. *Cf. Dickerson*, 460 U.S. at 110, 103 S.Ct. at 990 (the general rule of statutory construction is to look first to the language of the statute and then to the legislative history if the statute is unclear).

The majority also relies on *Atascadero State Hospital v. Scanlon*, —— U.S. ——, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) in holding that CERCLA does not abrogate the eleventh amendment bar to suits against the states. *Atascadero, supra*, involved § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1982), which conferred a right of action upon handicapped people who were discriminated against by "any recipient of federal assistance." In *Atascadero*, a plaintiff sought damages from a state hospital that received federal financial assistance. The *Atascadero* court, noting that Congress must express its intention to abrogate the eleventh amendment in unmistakable language in the statute itself, held that the "general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the eleventh amendment." *Atascadero*, 105 S.Ct. at 3147–49.

The case at bar is distinguishable from *Atascadero, supra*. The statute in *Atascadero* provides remedies for violations of § 504 by "*any recipient* of federal assistance" (emphasis added). However, there was no specific statutory language identifying the class of recipients of federal aid,

as in CERCLA, as "State, municipality, commission, political subdivision of a State, or any interstate body." Thus, the statute in *Atascadero* placed liability on a general class of potential defendants.

In the instant case, CERCLA provides that *any person* who owns or operates any facility at which hazardous waste is deposited is liable for the costs of the clean-up (emphasis added). In addition to the foregoing general liability provision, CERCLA further provides a specific provision identifying the class of potential defendants, *i.e.*, person means state. *See* 42 U.S.C. § 9601(21). Unlike the statute in *Atascadero*, the statute in the case at bar does more than place liability on a general class of potential defendants. CERCLA allows states to be subjected to suit by private persons, in "unmistakable language in the statute itself."

In the case at bar, I find no ambiguity in the language of CERCLA and no contrary legislative intent. The majority, therefore, had no occasion to "look beyond the plain language of the federal statute...." *Thorn v. Reliance Van Co., Inc.*, 736 F.2d 929, 932 (3d Cir.1984), *quoting, Aloha Airlines, Inc. v. Director of Taxation of Hawaii*, 464 U.S. 7, 12, 104 S.Ct. 291, 294, 78 L.Ed.2d 10 (1983). Accordingly, the definitional section of CERCLA, 42 U.S.C. § 9601(21), is controlling. CERCLA was passed with clear congressional intent, evidenced by its unambiguous statutory language, to abrogate states' eleventh amendment immunity.

### III.

As judges, we must never forget the complexity and the time constraints of the federal legislative process. Legislators do not have the time or the capacity to anticipate every possible argument that might be made subsequently by creative and clever counsel. They need not thwart every potential argument in the womb of time by writing volumes of legislative history which say no more than that the legislature meant what they said in the statute. As Justice Cardozo once observed "[w]e do not pick our rules of law full-blossomed from the trees." B. Cardozo, *supra* at 103. In this case, there was a bloom of sufficient specificity for the problems with which Congress was dealing. It is particularly ironic that private parties will now be denied the right to collect millions of dollars in damages [2] for which they should be reimbursed because the state was the party that improperly "disposed" of hazardous substances to the land and waterways of our Nation. Such a result is absurd and patently unfair when it is based on the assumption that Congress did not really mean "states" although it unambiguously included states as persons liable for the harm they cause in disposing of hazardous substances.

To return to Justice Cardozo, he so wisely observed that:

> [i]n countless litigations, the law is so clear that judges have no discretion. They have the right to legislate within gaps, but often there are no gaps. We shall have a false view of the landscape if we look at the waste spaces only, and refuse to see the acres already sown and fruitful.

*Id.* at 129. In this case, from my view the majority has failed to look at the landscape and appreciate the clear statutory language of Congress. I would reverse and

---

**2.** The amended complaint with revised damage estimates alleges that the United States has spent $1,400,000 on the clean up, of which $720,000 was collectible from Union Gas under CERCLA. It is the theory of Union Gas that much of the damage was caused by the state. Union Gas alleges that the state:

> ... caused the alleged release and discharge of coal tar and oil into Brodhead Creek by their acts, omissions and/or negligence including, *inter alia:*

> (a) The narrowing of the channel of Brodhead Creek on its western side and restriction of the channel with dikes thereby causing significant downcutting;
> (b) Excavating along the toe of the dike and backwater areas;
> (c) Failing to take corrective measures to prevent the downcutting.

Appendix ¶ 12 at 106a–107a.

remand this case to the district court for further proceedings.