UNITED STATES of America,

v.

UNION GAS COMPANY

v.

COMMONWEALTH OF PENNSYLVA-
NIA and the Borough of Stroudsburg.

Appeal of UNION GAS COMPANY.

No. 85–1177.

United States Court of Appeals,
Third Circuit.

Argued Jan. 7, 1986.

Reargued Following Remand From The
Supreme Court June 22, 1987.

Decided Nov. 3, 1987.

Robert A. Swift (argued), David H. Marion, Kohn, Savett, Marion & Graf, Philadelphia, Pa., Lawrence A. Demase, Rose, Schmidt, Chapman, Duff & Hasley, Pittsburgh, Pa., for appellant.

Leroy S. Zimmerman, Atty. Gen., Andrew S. Gordon (argued), Chief Deputy Atty. Gen., Harrisburg, Pa., for appellee.

Elaine Gail Suchman (argued), Asst. Atty. Gen., Robert Abrams, Atty. Gen., State of N.Y., Dept. of Law, Environmental Protection, New York City, John K. Van de Kamp, Atty. Gen., State of Cal., Clifford L. Rechtschaffen, Asst. Atty. Gen., San Francisco, Cal., Joseph I. Lieberman, Atty. Gen., State of Conn., Kenneth N. Tedford, Asst. Atty. Gen., Hartford, Conn., Linley E. Pearson, Atty. Gen., State of Ind., Jack Watson, Asst. Atty. Gen., Indianapolis, Ind., Thomas J. Miller, Atty. Gen., State of Iowa, John P. Sarcone, Asst. Atty. Gen., Des Moines, Iowa, David L. Armstrong, Atty. Gen., State of Ky., Dennis J. Conniff, Atty. Chief, Frankfort, Ky., J. Joseph Curran, Jr., Atty. Gen., State of Md., Richard M. Hall, Asst. Atty. Gen., Baltimore, Md., William L. Webster, Atty. Gen., State of Mo., Shelley A. Woods, Asst. Atty. Gen., Jefferson City, Mo., W. Cary Edwards, Atty. Gen., State of N.J., John J. Maiorana, Deputy Atty. Gen., Trenton, N.J., Lacy H. Thornburg, Atty. Gen., State of N.C., Raleigh, N.C., Anthony J. Celebrezze, Jr., Atty. Gen., State of Ohio, Paul D. Hancock, Asst. Atty. Gen., Columbus, Ohio, Robert H. Henry, Atty. Gen., State of Okl., Sara J. Drake, Asst. Atty. Gen., Oklahoma City, Okl., David L. Wilkinson, Atty. Gen., State of Utah, Fred G. Nelson, Asst. Atty. Gen., Salt Lake City, Utah, for amici curiae.

Before WEIS, HIGGINBOTHAM, BECKER, Circuit Judges.

## OPINION ON REMAND FROM THE SUPREME COURT

BECKER, Circuit Judge.

This appeal is before us for a second time, following remand by the Supreme

Court. It presents the same ultimate question that we addressed earlier: does the eleventh amendment bar defendant-third party plaintiff Union Gas Company from suing the Commonwealth of Pennsylvania in federal court for monetary damages in an action arising under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, or Superfund), 42 U.S.C. § 9601 *et seq.* (1982). *See United States v. Union Gas,* 792 F.2d 372 (3d Cir.1986) (*Union Gas I*). In our earlier decision, we affirmed the district court's judgment determining that the eleventh amendment barred the suit. The Supreme Court granted certiorari, vacated our earlier decision, and remanded the case "for further consideration in light of the Superfund Amendments and Reauthorization Act of 1986 [SARA], Pub.L. No. 99–499." *Union Gas v. Pennsylvania,* — U.S. —, 107 S.Ct. 865, 865, 93 L.Ed.2d 821 (1987).

■ We now reverse the district court's judgment, concluding that, in contrast to the legislative language upon which we based *Union Gas I,* SARA provides CERCLA with the requisite unmistakably clear language needed to abrogate the states' eleventh amendment immunity.[1] This conclusion on specificity requires us to reach an important, difficult and controversial issue—the power of Congress to abrogate the eleventh amendment not by the later fourteenth amendment but by the commerce power of the earlier Article I. We conclude that Congress possessed the constitutional power to abrogate the immunity and that we must apply this valid congressional enactment to the present case.

## I. FACTS AND PROCEDURAL HISTORY

Our earlier opinion, *Union Gas I,* set forth both the facts and the procedural history of the case in detail. *See* 792 F.2d at 374–75. We briefly review them here.

Predecessors of Union Gas Company owned and operated a facility that allegedly released hazardous substances at a site near Brodhead Creek in Stroudsburg, Pennsylvania. Long after the plant had been closed and dismantled, the Commonwealth of Pennsylvania, acting pursuant to an easement for flood control, excavated at the former Union Gas site and struck a large deposit of hazardous substances that began to seep into Brodhead Creek. Alerted to the seepage, the Environmental Protection Agency (EPA) ordered a clean-up, which Pennsylvania and the United States performed jointly. The United States, expending a total of approximately $720,000, reimbursed the Commonwealth for all of its costs.

The United States sued Union Gas in the district court for the Eastern District of Pennsylvania under CERCLA, 42 U.S.C. §§ 9604, 9607 (1982), for recoupment of costs incurred in cleaning up the Brodhead Creek spill. Union Gas, in turn, filed a third-party complaint against Pennsylvania, alleging that the Commonwealth had "negligently caused, or contributed to, the discharge" and should therefore shoulder at least part of the clean-up costs. 792 F.2d at 375. Believing that the eleventh amendment barred Union Gas' suit against it, the Commonwealth moved to dismiss, and the district court granted the Commonwealth's motion. Subsequently, the United States and Union Gas settled the principal action and the district court dismissed the lawsuit.

Union Gas thereupon appealed the district court's dismissal of Pennsylvania as a defendant, and a divided panel of this Court affirmed.[2] Noting that the Supreme

---

**1.** Congressional "abrogation" does not refer to an impermissible attempt to override a constitutional guarantee by a statutory decree. Rather, in traditional eleventh amendment parlance, abrogation refers to the ability of Congress to create a cause of action for money damages enforceable by a citizen suit against a state in federal court. *See In re McVey Trucking,* 812 F.2d 311, 314 n. 3 (7th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 227, 98 L.Ed.2d 186 (1987). The issue is thus not congressional power to legislate, but the effectiveness of a congressional grant of jurisdiction despite the eleventh amendment's limitation on Article III.

**2.** Judge Higginbotham dissented, noting that "[t]he basic issue is whether the [CERCLA] definitional section is sufficiently adequate in itself to find legislative intent to abrogate sovereign immunity. I think it is."

Court requires that "Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself," *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 243, 105 S.Ct. 3142, 3148, 87 L.Ed.2d 171 (1985) (footnote omitted), the panel found no such unmistakable expression of intent to abrogate in CERCLA.

Union Gas petitioned for certiorari on October 8, 1986. On October 17, the President signed the SARA amendments to CERCLA. Thereafter, the Supreme Court vacated our prior opinion and judgment and remanded the case for reconsideration in light thereof.

## II. CONGRESSIONAL INTENT TO ABROGATE THE STATES' ELEVENTH AMENDMENT IMMUNITY IN SARA

The eleventh amendment provides that: The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State. U.S. Const. amend. XI. Although the amendment does not expressly address suits against a state by its own citizens, the Supreme Court has interpreted it as embodying state sovereign immunity and has therefore constructed a presumptive bar against suits by citizens of the defendant state. *See Welch v. State Department of Highways and Public Transportation*, —— U.S. ——, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987); *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (*Pennhurst II*); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *see also infra* at 1354–55 (discussing extent of presumption).

### A. Standards for Imputing Congressional Intent to Abrogate the Eleventh Amendment

In our original panel opinion, we noted that eleventh amendment immunity "can

be avoided in only two ways: (a) Congress can *abrogate* it by providing through statute for suits against states, or (b) states can *waive* their sovereign immunity and consent to be sued." *Union Gas I*, 792 F.2d at 376 (emphasis in original). After the *vacatur* of our previous opinion, the Supreme Court decided *Welch* and noted the same two exceptions to the eleventh amendment's reach. *See* 107 S.Ct. at 2945–46.

We also explained in *Union Gas I* that, because of "the eleventh amendment's importance in maintaining the balance of power between state and federal interests," 792 F.2d at 376, the Supreme Court requires Congress to "express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself." *Id.* (quoting *Atascadero State Hospital v. Scanlon*, 473 U.S. at 243, 105 S.Ct. at 3148); *see also Pennhurst II*, 465 U.S. 89, 99, 104 S.Ct. at 907 (1984); *Quern v. Jordan*, 440 U.S. 332, 342–45, 99 S.Ct. 1139, 1146–47, 59 L.Ed.2d 358 (1979).

The Court has insisted that the statute, when read literally, not merely allow suits against the state, but that it do so with such specificity that it is clear that Congress consciously and directly focused on the issue of state sovereign immunity and chose to abrogate it.

792 F.2d at 376 (citations omitted).

The Supreme Court reaffirmed these principles in *Welch*, which emphasized that Congress can create an exception to the reach of the eleventh amendment only if it expresses its intent to do so in unmistakable language in the statute itself. *Welch* overturned, at least in part, the decision in *Parden v. Terminal Railway of Alabama Docks Dept.*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), in which the Court had found that Congress had intended to abrogate states' eleventh amendment immunity when it enacted the Federal Employers' Liability Act (FELA) and regulated

792 F.2d at 384 (Higginbotham, J., dissenting). On remand he reaffirms the views expressed

therein.

"[e]very common carrier by railroad while engaging in commerce between any of the several States...." 45 U.S.C. § 51 (1982). "Every common carrier," held *Parden*, included state-owned railroads and thus abrogated their eleventh amendment immunity. *Welch* explicitly overruled this holding in *Parden*, reinterpreting the very same provision of the FELA as it was incorporated by reference in the Jones Act.

Although our later decisions do not expressly overrule *Parden*, they leave no doubt that *Parden*'s discussion of congressional intent to negate Eleventh Amendment immunity is no longer good law.... In subsequent cases the Court consistently has required an unequivocal expression that Congress intended to override Eleventh Amendment immunity. Accordingly, to the extent that *Parden v. Terminal Railway* ... is inconsistent with the requirement that an abrogation of Eleventh Amendment immunity by Congress must be expressed in unmistakably clear language, it is overruled.

107 S.Ct. at 2948 (citations and footnote omitted).

### B. *CERCLA and the Eleventh Amendment*

■ In *Union Gas I*, we found that the language and structure of CERCLA did not sufficiently evince Congress' intention to abrogate the states' eleventh amendment immunity. SARA has now changed both the language and structure of CERCLA, and, as we explain below, SARA demonstrates Congress' unmistakable intent to subject the states to suit in federal court.

In *Union Gas I*, we acknowledged both that the liability section of CERCLA allows

those who have incurred clean-up costs to sue "any person" who owned or operated the waste site for all costs incurred in the removal effort, 42 U.S.C. § 9607(a) (1982), and that the definitional section defines person to include the "United States Government, [a] State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(21) (1982). We found this language insufficient to abrogate the eleventh amendment for two reasons.

■ First, the inclusion of a state in the § 9601(21) definition of persons allows the United States, which does the vast bulk of clean-up work, to sue states for reimbursement under § 9607(a). We concluded that, because of the structure of CERCLA, the language that allows the federal government to sue states cannot be deemed to express Congress' unmistakable intention to abrogate the states' eleventh amendment immunity from suits by individuals against state government.[3] Second, we noted the significance of § 9607(g), which explicitly waives the United States' sovereign immunity.[4] We interpreted the existence of this explicit waiver of federal sovereign immunity as a further indication that the definitional section was insufficient, in and of itself, to subject a state governmental body to suit, for reading CERCLA's definitional section to waive federal sovereign immunity would render § 9607(g) superfluous. We therefore reasoned that to impute to Congress the intention to abrogate states' immunity we would require a specific reference to states' immunity or some other explicit indication of abrogation. *See Union Gas I*, 792 F.2d at 380 ("abrogation of states' eleventh amend-

---

**3.** The eleventh amendment clearly permits statutes that provide for suits by the federal government against the states, *see, e.g., United States v. Mississippi*, 380 U.S. 128, 140–41, 85 S.Ct. 808, 814–15, 13 L.Ed.2d 717 (1965), yet such statutes do not operate to abrogate the states' constitutional immunity from suits in federal court brought by individuals. *See Employees of Dep't of Pub. Health & Welfare v. Missouri Dep't of Pub. Health & Welfare*, 411 U.S. 279, 285–86, 93 S.Ct. 1614, 1618–19, 36 L.Ed.2d 251 (1972).

**4.** At the time, § 9607(g) read in its entirety: Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any non-governmental entity, including liability under this section.

42 U.S.C. § 9607(g) (1982). This waiver was amended and recodified at 42 U.S.C.A. § 9620(a)(1) (West Supp.1987) by SARA. In order to avoid confusion, we continue to refer to that provision as § 9607(g).

ment immunity requires no less a showing of congressional intent than does waiver of federal sovereign immunity").

In SARA, however, Congress enacted the unmistakably clear statutory language that demonstrates its intent to abrogate the states' eleventh amendment immunity. Section 101 of SARA, entitled "Amendments to Definitions," adds a new paragraph to CERCLA which defines "owner or operator":

> The term "owner or operator" does not include a unit of State or local government which acquired ownership or control involuntarily through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government involuntarily acquires title by virtue of its function as sovereign. The exclusion provided under this paragraph shall not apply to any State or local government which has caused or contributed to the release or threatened release of a hazardous substance from the facility, and such a *State or local government shall be subject to the provisions of this Act in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title* [cost recovery actions].

42 U.S.C.A. § 9601(20)(D) (West Supp.1987) (emphasis supplied).

Two points of analysis support our conclusion that the amendment to § 9601 provides the requisite unmistakably clear language. First, the plain language of the statute indicates a clear intention to abrogate. Congress provided that a state "shall be subject to the provisions of this Act in the same manner and the same extent" as any nongovernmental entity. As the emphasized portion of § 9601(20)(D) demonstrates, Congress, in amending CERCLA, specifically contemplated the unique position of states in the constitutional scheme and, in certain circumstances, chose to make them liable to suit by individuals in federal court.

Second, SARA now applies exactly the same waiver to states that it applies to the federal government. The language of the final portion of § 9601(20)(D) replicates for all practical purposes § 9607(g), which waives the sovereign immunity of the federal government. Thus, CERCLA, as amended by SARA, treats the United States and the states similarly—enumerating both as "persons" and withdrawing the immunity from both. Even if we were to require a greater showing of congressional intent to abrogate the states' eleventh amendment immunity than is necessary to waive the federal government's sovereign immunity, *see Union Gas I,* 792 F.2d at 380 n. 13, this higher threshold would be satisfied by SARA. SARA's definitional section, which replicates the federal waiver and which specifically contemplates the function of the states as separate sovereigns, addresses this concern.

In *Union Gas I,* the panel, relying on the special federal waiver section of CERCLA, believed that Congress, by explicitly waiving federal sovereign immunity in § 9607(g), demonstrated that more than enumeration in a definitional section was required to abrogate governmental immunity. Although this argument based on § 9607(g) is no longer tenable, given the SARA amendments to that section, we must nevertheless grapple with the question of whether definitional language alone may express congressional intent as to abrogation. As a general matter, we believe that mere enumeration in a definitional section remains insufficient as evidence of congressional intent to abrogate. In our case, however, the definitional section contains a substantive direction that "state or local government shall be subject to the provisions of [CERCLA] in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607." 42 U.S.C.A. § 9601(20)(D) (West Supp.1987). Although found in a definitional section, the language is not definitional in character; it far exceeds the bare enumeration we found insufficient to indicate congressional intent to abrogate in *Union Gas I.* On the contrary, its clear mandate, replicating the language of the federal waiver, satisfies our concerns about

congressional intent to render the states amenable to suit.

A third point arises from SARA's amendment of the act's federal immunity waiver in § 9607(g). In *Union Gas I,* we found that the existence of a special section waiving federal immunity indicated that Congress had given special thought to waiving federal immunity and had not given equivalent attention to the question of state immunity. Essentially we inferred that Congress, by not providing an analogous state waiver, did not intend to abrogate the eleventh amendment. This federal waiver, now codified at 42 U.S.C.A. § 9620(a)(1) (West Supp.1987), has been amended, however, to provide that "[n]othing in this section shall be construed to affect the liability of any person or entity under sections 9606 [i.e., abatement actions] and 9607 [i.e., cost recovery actions]." This amendment precludes the reading of § 9607(g) employed in *Union Gas I,* which construed the federal waiver "to affect the liability of" states.

The explicit abrogation of the eleventh amendment in SARA distinguishes this case from *Employees of Department of Public Health & Welfare v. Missouri Department of Public Health & Welfare,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1972). As we noted in *Union Gas I, Employees* demonstrates that the statutory suggestion that states might be sued, when found in a provision separate from the one that creates the cause of action, may be insufficient to demonstrate congressional intent. Here, too, there are separate provisions concerning liability and amenability of states to suit in federal court. However, the clear congressional language provided by SARA overcomes this concern.

In *Union Gas I,* we did not confine our examination to the words of CERCLA. Rather, because these sections had not by their language evinced the congressional intent to abrogate, we canvassed other areas of the statute for such an indication. Having found that Congress in SARA has now enacted clear statutory language to abrogate the states' eleventh amendment immunity in §§ 9601(20)(D) and 9620(a)(1), we need not address the other areas. Even if they remain inconclusive after SARA, they do not operate to nullify the clear statutory language found in other provisions.

▪ For example, SARA adds a citizen suit provision to CERCLA that provides for suits "against any person (including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution)." 42 U.S.C.A. § 9659(a)(1) (West Supp.1987). While this provision expressly prevents abrogation of eleventh amendment immunity in *citizen suits* under CERCLA, it does not operate to nullify such abrogation in § 9607 liability actions. To the contrary, its inclusion implies that CERCLA had elsewhere abrogated states' eleventh amendment immunity, but did not extend that abrogation to § 9659 citizen's suits. Congress had no reason to declare the states immune from citizens' suits unless it had abrogated the states' eleventh amendment immunity elsewhere in the act. By holding that Congress abrogated the eleventh amendment for some provisions of CERCLA, we give effect to the § 9659(a)(1) limitation on citizens' suits. *See* 2A *Sutherland Statutory Construction* § 46.06 (4th ed. 1984 rev.) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous.").

Moreover, distinguishing citizens' suits from liability actions for eleventh amendment purposes makes perfect sense in light of the differing functions of the two provisions. Section 9659 suits are designed to allow citizens, acting as private attorneys general, to bring civil actions to ensure effective implementation of CERCLA. Section 9607 suits, on the other hand, provide compensation for liability, and hence are more defined and circumscribed by actual harms already suffered. Therefore, it is perfectly reasonable to assume that Congress intentionally limited the reach of citizen actions but chose not to do so for liability suits.

We read the applicable Supreme Court precedent to instruct us to look first at Congress' statutory language as the best indication of intent to abrogate the elev-

enth amendment; only in the absence of clear language are we to rely on the legislative history of an enactment. *See Hutto v. Finney,* 437 U.S. 678, 698 n. 31, 98 S.Ct. 2565, 2577 n. 31, 57 L.Ed.2d 522 (1978). Although we need not rely on the legislative history of SARA because we find that the amendments have provided the requisite clear language, the legislative history supports our holding and would sustain it even were the statutory language less clear.

Originally, neither the Senate nor House version of SARA § 101(b)(1) copied the waiver language of § 9607(g) to abrogate state eleventh amendment immunity. However, the conference committee inserted language that replicated the federal waiver into the definition section, stating that its purpose was "to clarify that if the unit of government caused or contributed to the release or threatened release in question, then such unit is subject to the provisions of CERCLA, both procedurally and substantively, as any non-governmental entity, including liability under section 107 and contribution under section 113." H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess. 185–86, *reprinted in* 1986 U.S.Code Cong. & Admin.News 2835, 3276, 3278–79. To the extent that the added language serves to "clarify" CERCLA, it amounts to a subsequent declaration of congressional intent that deserves great weight. *Red Lion Broadcasting v. F.C.C.,* 395 U.S. 367, 380– 82, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969).

In sum, SARA contains statutory language that demonstrates the requisite unmistakable congressional intent to abrogate the states' eleventh amendment immunity from suit, and SARA's legislative history corroborates this view.

## III. *CONGRESSIONAL POWER TO ABROGATE THE STATES' ELEVENTH AMENDMENT IMMUNITY*

█ Appellee Commonwealth of Pennsylvania and the amici states correctly note that, if we find that Congress has clearly indicated its intent to abrogate the eleventh amendment, we must face a constitutional issue: whether Congress' Article I commerce clause powers are sufficient to abrogate the states' eleventh amendment immunity. As Justice Marshall structured the question, abrogation concerns a two-step inquiry:

> (1) did Congress ... effectively lift the State's protective veil of sovereign immunity; and (2) even if Congress did lift the State's general immunity, is the exercise of federal judicial power barred in the context of this case in light of Art. III and the Eleventh Amendment?

*Employees,* 411 U.S. at 287–88, 93 S.Ct. at 1619 (Marshall, J., concurring in the result); *see also Edelman,* 415 U.S. at 672, 94 S.Ct. at 1360 (inquiring into "threshold fact of congressional authorization"); *cf. In re McVey Trucking,* 812 F.2d 311, 314 (7th Cir.1987) (reversing the order of this two-step inquiry), *cert. denied* ── U.S. ──, 108 S.Ct. 227, 98 L.Ed.2d 186 (1987). We therefore turn to the issue of Congress' power to allow citizen suits against the states pursuant to CERCLA, despite the eleventh amendment's limitation on Article III federal jurisdiction.[5]

The Commonwealth and amici argue that only certain types of exercise of congressional power may abrogate the eleventh amendment, and that the Constitution does not grant Congress the power to create an exception to the eleventh amendment in CERCLA. They argue that Congress may only directly abrogate the eleventh amendment when it acts pursuant to constitutional amendments passed *after* the eleventh. The Commonwealth and amici argue that, "because of the unique character of the Fourteenth Amendment, Congress may, through an unequivocal expression of its intent, subject an unconsenting state to a private suit in federal court when seeking

---

**5.** In *Union Gas I,* we first decided the statutory issue of congressional intent to abrogate. Having found no such intent, we did not need to reach the constitutional issue. *See Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (avoiding unnecessary constitutional issues); *Siler v. Louisville & Nashville R.R.,* 213 U.S. 175, 193, 29 S.Ct. 451, 455, 53 L.Ed. 753 (1909) (same).

to enforce the Fourteenth Amendment." Brief of Amici at 9. According to this reasoning, the thirteenth, nineteenth, and twenty-fourth amendments would also allow Congress to limit the eleventh amendment because they (1) were ratified with an awareness of the eleventh amendment, (2) restrict the powers of states, and (3) grant authority to Congress to enact enforcing legislation.

■ We fully agree with the contention that Congress may override the eleventh amendment when acting pursuant to the powers enumerated above. We disagree, however, with the argument that congressional power to abrogate the eleventh amendment is limited only to those powers granted by the Constitution to Congress after the ratification of the eleventh amendment. Our reasoning is set forth below.

The Supreme Court has explicitly recognized that the fourteenth amendment grants Congress the power to subject states to suit in federal court notwithstanding the limitations of the eleventh amendment. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Congress enacted CERCLA, however, pursuant to its Article I commerce clause power, *see Hodel v. Virginia Surface Mining and Reclamation Association,* 452 U.S. 264, 282, 101 S.Ct. 2352, 2363, 69 L.Ed.2d 1 (1981); *Wickland Oil Terminals v. Asarco, Inc.,* 654 F.Supp. 955, 957 (N.D.Cal. 1987), not its power under section five of the fourteenth amendment. We must therefore decide whether Congress may subject states to private suits in federal court when acting pursuant to its Article I commerce clause powers. This question has never been directly answered by the Supreme Court, which has chosen either to expressly reserve the question, *see County of Oneida, New York v. Oneida Indian Nation of New York State,* 470 U.S. 226, 252, 105 S.Ct. 1245, 1261, 84 L.Ed.2d 169 (1985), or to "assume, without deciding or intimating a view of the question, that the authority of Congress to subject consenting States to suit in federal court is not confined to § 5 of the Fourteenth Amend-

ment." *Welch,* 107 S.Ct. at 2946. Our analysis of Congress' authority to subject states to suit under Article I requires an examination of the significance of distinctions between Article I and the fourteenth amendment, the history and language of the eleventh amendment, and the inherent protections offered to state sovereignty in the constitutional framework.

A. *Article I and the Fourteenth Amendment: Must We Read the Constitution on a Timeline?*

■ As a threshold matter, we disagree with Appellee's submission that only the amendments following the eleventh may override it. This reasoning would require that we read the Constitution on a timeline, a proposition we reject. Rather, we believe that we must interpret every provision in the Constitution in the light of the entire document. As the Supreme Court recognized long ago,

> [t]he Constitution of the United States, with the several amendments thereof, must be regarded as one instrument, all of whose provisions are to be deemed of equal validity. It would, indeed, be most unfortunate if the immunity of the individual states from suits by citizens of other states, provided for in the Eleventh Amendment, were to be interpreted as nullifying those other provisions which confer power on Congress to regulate commerce among the several states, which forbid the states from entering into any treaty, alliance or confederation, from passing any bill of attainder, *ex post facto* law or law impairing the obligation of contracts ...—all of which provisions existed before the adoption of the Eleventh Amendment, which still exist, and which would be nullified and made of no effect, if the judicial power of the United States could not be invoked to protect citizens affected by the passage of state laws disregarding these constitutional limitations.

*Prout v. Starr,* 188 U.S. 537, 543, 23 S.Ct. 398, 400, 47 L.Ed. 584 (1903); *accord Richardson v. Ramirez,* 418 U.S. 24, 42–43, 94 S.Ct. 2655, 2665–66, 41 L.Ed.2d 551 (1974). In *Billings v. United States,* 232 U.S. 261,

282, 34 S.Ct. 421, 424, 58 L.Ed. 596 (1914), the Court further recognized that "the Constitution is not self-destructive. In other words, that the powers which it confers on the one hand it does not immediately take away on the other...."

Thus, even though the fourteenth amendment gives Congress the power to create causes of action that would subject a state to private suits in federal court, "[t]he fact that the Fourteenth Amendment was enacted after the Eleventh Amendment does not abrogate the latter in cases involving the former. The two amendments must be interpreted in light of each other." *Townsend v. Edelman*, 518 F.2d 116, 120 (7th Cir.1975). Similarly, the Court of Appeals for the Seventh Circuit in *McVey Trucking* refused to accept the notion that the fourteenth amendment "repealed" the eleventh and hence rejected the premise that only post-fourteenth amendment congressional powers could serve as the basis for legislation to abrogate the amendment. 812 F.2d at 316. We, too, reject the argument that Congress may override the eleventh amendment only under authority granted after the enactment of the eleventh amendment.

■ Although we recognize that Congress must act under a plenary grant of constitutional authority to abrogate the eleventh amendment, *see McVey Trucking*, 812 F.2d 311, 320 (7th Cir.1987) (citing *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985)), we disagree with the appellant's contention that the fourteenth amendment's grant of plenary powers to Congress is unique and thus distinguishable from Congress' plenary power to regulate interstate commerce as granted in Article I. In this matter we are persuaded by the reasoning of *McVey Trucking*, where the court examined possible distinctions between the fourteenth amendment and Article I for purposes of eleventh amendment abrogation and found them untenable.

In a thorough, scholarly opinion, authored by Judge Flaum, *McVey Trucking* reviewed and rejected the notion that the fourteenth amendment represents an "ultra-plenary" grant of authority.[6] 812 F.2d at 319–23. *McVey Trucking* also rejected the notion that "*Fitzpatrick* could be read to suggest that each grant of power contained in the Constitution must be linked to a provision that 'by [its] own terms' limits state authority in order for Congress, acting under that power, to create a cause of action for money damages against a state." 812 F.2d at 320 (citation omitted). The court observed that any plenary grant of power to Congress is a limitation on state authority, and that the two provisions were not distinguishable on the basis of the explicit reference to states in the fourteenth amendment. *Id.* at 321. We are convinced, as well, that the power of these two sections of the Constitution does not vary for the purposes of abrogating state immunity from suit.

■ We acknowledge that the Court has drawn a distinction between Article I and the fourteenth amendment in divining congressional intent.[7] *Hutto v. Finney* suggests something of a sliding scale for the clarity of congressional expression of intent, depending on the source of the congressional power under which Congress is legislating. Where Congress acts pursuant to its Article I power, which "has grown to vast proportions in its applications," *Employees*, 411 U.S. at 285, 93 S.Ct. at 1618 (FLSA regulations), it must do so in "unmistakable language in the statute itself." *Atascadero*, 473 U.S. at 243, 105 S.Ct. at 3148. However, when Congress legislates pursuant to § 5 of the fourteenth amendment, "whose other sections by their own terms embody limitations on state authority," *Fitzpatrick*, 427 U.S. at 456, 96 S.Ct. at 2671, the standard for demonstrating

---

6. Judge Flaum's opinion in *McVey* carefully examined the extent to which the eleventh amendment limits Congress' Article I powers and held that Congress may make states amenable to suit in federal court for money damages under the bankruptcy clause, U.S. Const. Art. I, § 8, cl. 4.

7. Indeed, in *Union Gas I*, we concluded that where the statutory language is lacking, the Supreme Court required "virtually overwhelming" evidence from the legislative history of congressional intent to abrogate. 792 F.2d at 378.

congressional intent is less strict and may be supported by the legislative history alone. *Hutto v. Finney,* 437 U.S. at 698 & n. 31, 98 S.Ct. at 2577 & n. 31. Although a clearer expression of intent is required for an Article I enactment, the requirement is not because the fourteenth amendment is a stronger grant of power. Rather, congressional intent to abrogate is easier to infer from a fourteenth amendment enactment.

### B. *The Language and History of the Eleventh Amendment*

In addressing the scope of congressional power to abrogate, an understanding of the purpose and scope of the amendment is required. Therefore, a brief review of the history of the eleventh amendment is essential.

The eleventh amendment was a reaction to the Supreme Court's decision in *Chisolm v. Georgia,* 2 U.S. [2 Dall.] 419, 1 L.Ed. 440 (1793), in which the Court construed Article III's extension of the judicial power over controversies "between a State and Citizens of another State" to make states amenable to suit in federal court by citizens of another state.[8] *See Pennhurst II,* 465 U.S. at 91–98, 104 S.Ct. at 903–06; *Petty v. Tennessee–Missouri Bridge Commission,* 359 U.S. 275, 276, 79 S.Ct. 785, 787, 3 L.Ed.2d 804 (1959); *McVey Trucking,* 812 F.2d at 317. In swift response to this construction of Article III, Congress and the States passed the eleventh amendment to provide:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State. U.S. Const. amend. XI.

In light of the circumstances surrounding the passage of the eleventh amendment, this language has been construed to mean that courts cannot, pursuant to their Article III powers, subject states to suit. Thus, the language of the amendment does not, nor was it ever intended to, limit Congress' Article I powers; rather, it limits the courts' power to construe the grant of judicial power in Article III to abrogate the state's presumptive immunity from diversity suits. *See* Tribe, *Intergovernmental Immunities in Litigation, Taxation, and Regulation: Separation of Powers Issues in Controversies About Federalism,* 89 Harv.L.Rev. 682, 693–99 (1976).

Courts have broadly extended the principles of state sovereign immunity that underlie the eleventh amendment and have applied them to cases outside the technical language of the amendment. For example, the eleventh amendment does not, by its terms, limit all Article III jurisdiction. The words of the amendment seem to limit only the diversity jurisdiction over disputes "between a State and Citizens of another State." *See McVey Trucking,* 812 F.2d at 317–19; Fletcher, *A Historical Interpretation of the Eleventh Amendment: A Nar-*

---

**8.** Scholars have argued the eleventh amendment was only intended to reach diversity jurisdiction, not federal question jurisdiction as is involved here. They point out that the problem with the *Chisolm* decision was not its abrogation of state immunity in general, but its abrogation in a diversity setting in which Georgia law would not have immunized the state from suit. As Professor Amar points out in *Of Sovereignty and Federalism,* 96 Yale L.J. 1425, 1467–72 (1987), the action in *Chisolm* was for assumpsit—a state law cause of action. Historically, therefore, it may be wiser to view the eleventh amendment as a response to an *Erie*-type problem, rather than a problem of state sovereignty. This interpretation also explains what some have characterized as the inadvertent exclusion in the amendment of suits between a state and citizens of that state. Because this category of suits is immune from federal

diversity, and immune to a *Chisolm*-like incursion, the framers did not include it in the amendment. *See id.* at 1474.

We need not address the historical argument that the eleventh amendment was never intended to reach federal question jurisdiction. It is sufficient for us to note that the eleventh amendment was intended as a limitation on judicial, not congressional, power. Amar also notes that the language of the eleventh amendment stating that "the judicial power shall not be construed to" indicates that its drafters intended to restrict judicial, not congressional abrogation of sovereign immunity. Amar points out that an earlier draft of the amendment used "shall not extend," but that such language might have prevented even affirmative jurisdictional grants. *Id.* at 1482. This argument supports our conclusion.

*row Construction of an Affirmative Grant of Jurisdiction Rather than a Prohibition Against Jurisdiction,* 35 Stan.L. Rev. 1033 (1983). However, in *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), the Court held that the eleventh amendment barred suits based on federal question jurisdiction. That case provides an example of the breadth of application. Although the eleventh amendment does not on its face address federal question jurisdiction, the Supreme Court has instructed that "we cannot rest with a mere literal application ... or assume that the letter of the Eleventh Amendment exhausts the restrictions upon suits against non-consenting States. Behind the words of the constitutional provisions are postulates which limit and control." *Principality of Monaco v. Mississippi,* 292 U.S. 313, 322, 54 S.Ct. 745, 748, 78 L.Ed. 1282 (1934).

The *theory* of sovereign immunity, which undergirds the eleventh amendment, has thus led the Supreme Court to fashion a presumption that a congressional enactment conferring general federal question jurisdiction does not operate to subject states to suit. *See Hans,* 134 U.S. at 13, 10 S.Ct. at 506; *McVey Trucking,* 812 F.2d at 318 ("as a sovereign, a state is presumptively immune from suit in a federal court even if the cause of action arises under federal law"). As we have discussed at length in Part II, only Congress' clearly articulated decision to subject the states to suits by private individuals in federal court operates to rebut this presumption. The presumption of immunity and the high threshold for its rebuttal animate the notion of sovereignty that underlies the eleventh amendment. Given this strong presumption, where Congress has clearly articulated its desire to abrogate the eleventh amendment, any further expansion of the eleventh amendment is unwarranted.

In sum, the language and history of the eleventh amendment provide substantial checks on the ability of the federal government to subject states to suit in federal court. First, the Supreme Court has extended the reach of the amendment, granting state immunity from suits by citizens of the same state, and from suits involving many federal questions. Second, Congress may only override the eleventh amendment when acting under a grant of plenary authority; the presumption of immunity is high, however, and the congressional exercise of a grant of plenary authority alone is not enough. Thus, where the Court has recognized congressional power to override the amendment, as in section 5 of the fourteenth amendment, the Court has required that Congress speak with unmistakable clarity.

Such limitations on abrogation of the eleventh amendment protect state sovereignty consistent with the amendment's purposes, and limit the reach of congressional authority to override under Article I. Moreover, as we discuss in the following section, implicit in the constitutional plan are limitations on Congress' power and incentive to abrogate state sovereign immunity under Article I. As the final phase of our analysis of the question of congressional power to abrogate eleventh amendment protection under the aegis of Article I, we now consider these limitations within the framework of the constitutional design.

## C. *The Constitutional Design*
### 1. *Checks and Balances*

The eleventh amendment reflects our system of checks and balances by limiting the power to abrogate sovereign immunity to the freely elected legislative branch. This design permits the legislative branch limited power to abrogate state immunity pursuant to grants of constitutional authority, while preventing the judiciary from independently using Article III to do the same. By adopting the eleventh amendment Congress and the states expressed their desire to limit judicial action. Congress, however, never meant to curtail its own power to limit sovereign immunity where appropriate. Indeed, holding that states maintain their immunity in the face of national control "is inconsistent with the constitutional plan." Tribe, 89 Harv.L.Rev. at 694–95 (footnotes omitted).

This dichotomy between the power of the judiciary and the Congress is particularly

significant in the area of commerce clause regulation. In this regard, it is pertinent that CERCLA is a commerce clause regulation. As Justice Brennan has stated in dissent, "judicial interpretation of our Constitution settled since the time of Mr. Chief Justice Marshall ... postulate[s] that the Constitution contemplates that restraints upon exercise by Congress of its plenary commerce power lie in the political process and not in the judicial process." *National League of Cities v. Usery*, 426 U.S. 833, 857, 96 S.Ct. 2465, 2476, 49 L.Ed.2d 245 (1976) (Brennan, J., dissenting). Justice Brennan's dissenting position, which mirrors the majority position in the case overruled by *Usery, Maryland v. Wirtz*, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), has again come to be the law of the land. *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 550–52, 105 S.Ct. 1005, 1017–19, 83 L.Ed.2d 1016 (1985). In contrast, our system of checks and balances dictates that the unelected federal judiciary, isolated from the political pressures that inhere in the need for reelection, must be constrained by such a constitutional restriction from abrogation of sovereign immunity.

In addition, the requirement of a clear statement before Congress may override the eleventh amendment assures that congressional intent will be followed, *see Peel v. Florida Department of Transportation*, 600 F.2d 1070, 1081 (5th Cir.1979), and serves to check judicial interpretation of statutes. *See Welch*, 107 S.Ct. at 2946; *cf. American Fire & Casualty Co. v. Finn*, 341 U.S. 6, 17, 71 S.Ct. 534, 542, 95 L.Ed. 702 (1951) ("The jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation...."). To extend the eleventh amendment to render nugatory a clear expression of congressional intent to abrogate state immunity would thwart the Constitution's plan by ignoring the representative nature of Congress.

The scope of Congress' power to abrogate the eleventh amendment under Article I is also limited by states' representation in Congress. The Congress, comprised wholly of delegates chosen by states (through their subdivisions), will respond to state needs and therefore does not require the eleventh amendment limitation. The Supreme Court in *Garcia*, 469 U.S. at 550, 105 S.Ct. at 1018, observed that "the principal means chosen by the Framers to ensure the role of the States in the Federal system lies in the structure of the Federal Government itself." And, as Professor Tribe notes, "it has generally been recognized that the states are represented in Congress and that Congress will be attentive to concerns of state governments as separate sovereigns." Tribe, 89 Harv.L.Rev. at 695 (footnote omitted).

### 2. *Federalism*

Extending the eleventh amendment to prohibit congressional power to abrogate under Article I would ignore the states' representation in Congress and their consent to diminished power implicit in their acceptance of the Constitution. The Supreme Court itself has recognized that in some situations states have given up their immunity in the constitutional plan: "States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been 'a surrender of this immunity in the plan of the convention.'" *Principality of Monaco*, 292 U.S. at 322–23, 54 S.Ct. at 748 (quoting *The Federalist, No. 81* (A. Hamilton)) (footnote omitted).

Thus, just as Congress acting pursuant to section 5 of the fourteenth amendment is "exercising legislative authority that is plenary within the terms of the constitutional grant ... under one section of a constitutional amendment whose other sections by their own terms embody limitations on state authority," *Fitzpatrick*, 427 U.S. at 456, 96 S.Ct. at 2671, so Congress acts under its Article I powers to "regulate Commerce ... among the several States," § 8, cl. 3, and "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers." § 8, cl. 18. By assenting to federal authority to regulate commerce, the states necessarily surrendered their sovereignty over that area. "There was not a State in the Union, in which there did not, at that time,

exist a variety of commercial regulations; ... By common consent, those laws dropped lifeless from their statute books, for want of sustaining power that had been relinquished to Congress." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 226, 6 L.Ed. 23 (1824).[9]

Congress' authority over interstate commerce stems from the plenary powers that have been granted to our national legislature and represents a displacement of state sovereignty. *See Garcia*, 469 U.S. at 548–49, 105 S.Ct. at 1016–17 (citing both Art. I, § 8 and the fourteenth amendment as "sharp contraction[s] of state sovereignty"). Hence, every federal appellate court to have addressed the question has found that Congress may subject the states to suit in federal court, the eleventh amendment notwithstanding, when acting pursuant to its plenary powers. *See McVey Trucking*, 812 F.2d at 328; *County of Monroe v. Florida*, 678 F.2d 1124, 1128–35 (2d Cir.1982) (congressional power over extradition, Art. IV, § 2, cl. 2), *cert. denied*, 459 U.S. 1104, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983); *Peel v. Florida Department of Transportation*, 600 F.2d 1070, 1074–82 (5th Cir.1979) (war powers clause, Art. I, § 8, cl. 11–13); *Mills Music, Inc. v. Arizona*, 591 F.2d 1278, 1285 (9th Cir.1979) (copyright and patent clause, Art I, § 8, cl. 8); *Jennings v. Illinois Office of Educ.*, 589 F.2d 935, 937–44 (7th Cir.) (war powers clauses), *cert. denied*, 441 U.S. 967, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979). We agree.

### 3. Conclusion

■ The constitutional scheme of checks and balances places powerful constraints, both structural and political, upon the abrogation of the states' eleventh amendment immunity. However, the participation of the states in our federal scheme has resulted in a relinquishment of state authority in the commerce area. We conclude that a constitutional grant of plenary authority to Congress is sufficient to support legislation that subjects the states to suit in federal court when the legislation speaks with unmistakable clarity. We, therefore, hold that when acting under the commerce clause to enact CERCLA and amend it with SARA, Congress possessed the power to abrogate the eleventh amendment.[10]

## IV. RETROACTIVITY

Having found that Congress, in enacting CERCLA and SARA, (1) explicitly intended to provide for suits by a citizen against a state, and (2) had the constitutional power to so abrogate the eleventh amendment for Superfund suits, we need only decide one remaining issue. SARA's grant of jurisdiction was not effected until the amendment became law on October 17, 1986, long after the Brodhead Creek excavation, the initiation of Union Gas' third-party complaint, and the initial appeal to us. We must therefore inquire whether SARA's jurisdictional grant controls the instant dispute.

Generally speaking, we must account for a change of law on appeal. *See Poleto v. Conrail*, 826 F.2d 1270, 1281–82 (3d Cir.

---

**9.** As one commentator has noted,

> The commerce clause comprises, however, not only the direct source of the most important peace-time powers of the National Government; it is also, except for the due process of law clause of Amendment XIV, the most important basis for judicial review in limitation of State power. The latter, or restrictive, operation of the clause was, in fact, long the more important one from the point of view of Constitutional Law. Of the approximately 1400 cases which reached the Supreme Court under the clause prior to 1900, the overwhelming proportion stemmed from State legislation.

E. Corwin, *The Constitution and What it Means Today* 67 (14th ed. 1978). Hence, even where

Congress has not acted, the Commerce Clause restrains state actions that affect interstate commerce in a discriminatory manner. *See Philadelphia v. New Jersey*, 437 U.S. 617, 623–24, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978).

**10.** Because we find that Congress lifted the states' eleventh amendment immunity at least when it enacted SARA, *but see infra* n. 11, we need not distinguish between court's powers to grant retroactive or prospective relief. In the absence of an eleventh amendment problem, either or both may be appropriate. *See Fitzpatrick*, 427 U.S. at 456–57, 96 S.Ct. at 2671–72; *Peel*, 600 F.2d at 1081–82.

1987). We have constantly reaffirmed our obligation to "apply the law in effect when [we] resolve[ ] an appeal. The court will apply a statute passed after decision in the trial court if that law is a valid enactment." *Danbury, Inc. v. Olive*, 820 F.2d 618, 625 (3d Cir.1987) (citing *Thorpe v. Housing Authority*, 393 U.S. 268, 281–82, 89 S.Ct. 518, 525–26, 21 L.Ed.2d 474 (1969)). As Chief Justice Marshall explained almost two centuries ago,

> if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. If the law be constitutional, ... I know of no court which can contest its obligation.

*United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801).

The Supreme Court has clearly held that this rule applies to statutory changes that contract the jurisdiction of the federal courts. *See, e.g., Bruner v. United States*, 343 U.S. 112, 116–17, 72 S.Ct. 581, 584, 96 L.Ed. 786 (1952) ("when a law conferring jurisdiction is repealed without any reservation as to pending cases, all cases fall with the law"). It has held with equally clarity that, when a law expands the jurisdiction of the federal courts, that expansion governs cases on direct appeal. *See, e.g., Andrus v. Charlestone Stone Products Co.*, 436 U.S. 604, 607–08 n. 6, 98 S.Ct. 2002, 2005 n. 6, 56 L.Ed.2d 570 (1978); *United States v. Alabama*, 362 U.S. 602, 604, 80 S.Ct. 924, 926, 4 L.Ed.2d 982 (1960) (per curiam). Thus, "where Congress has expanded the jurisdiction of the courts in response to a perceived gap in a statutory judicial scheme," we are not free to ignore that jurisdictional grant when considering cases on direct appeal. *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1084 (1st Cir.1986); *accord Sandefur v. Cherry*, 718 F.2d 682, 684–85 (5th Cir.1983) ("it would be wasteful to both the parties and the courts to dismiss this appeal for lack of federal jurisdiction, for it could be at once refiled").[11]

Because its expansion of jurisdiction is treated like all other changes of law on appeal, SARA's amendments to CERCLA control cases pending on direct appeal. We therefore find that the Commonwealth of Pennsylvania is amenable to the suit brought by Union Gas in the instant action.

## V. CONCLUSION

Congress, in enacting CERCLA and amending it with SARA, provided in clear and explicit statutory language evidence of its intent to allow Superfund suits by a citizen against a state. Moreover, Article I grants Congress the constitutional power to so abrogate the eleventh amendment for Superfund suits. Insofar as SARA represents a change in the law, it applies to suits pending on direct appeal. The Commonwealth of Pennsylvania thus cannot interpose the eleventh amendment to immunize it from suit by Union Gas pursuant to CERCLA. We therefore will reverse the judgment of the district court and remand the case for further proceedings.

11. One circuit has seemingly held that Congress must have intended a jurisdictional grant to apply to cases pending on direct appeal. *See Carlton v. BAWW, Inc.*, 751 F.2d 781, 787 n. 6 (5th Cir.1985) (holding that Congress intended amendments to bankruptcy jurisdiction to apply to pending cases). We note that in SARA, Congress intended the amendments to the relevant sections of CERCLA "to *clarify* that if the unit of government caused or contributed to the release or threatened release in question, then such unit is subject to the provisions of CERCLA, both procedurally and substantively, as any non-governmental entity, including liability under section 107 and contribution under section 113." H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin. News 3276, 3278–79 (emphasis added). Because Congress intended SARA to serve as a clarification of existing law, Congress apparently intended that CERCLA, even before SARA, would abrogate the states' eleventh amendment immunity. We may therefore apply to pending cases, as well as those initiated after SARA, Congress' abrogation of the eleventh amendment.