862 F.2d 681
 George McNABB, Appellee,
v.
UNITED STATES DEPARTMENT OF EDUCATION, and William Bennett,
Secretary of the U.S. Department of Education, Appellants,
Arkansas Department of Human Services, Division of Services
for the Blind.
George McNABB, Appellee,
v.
UNITED STATES DEPARTMENT OF EDUCATION, and William Bennett,
Secretary of the U.S. Department of Education,
Arkansas Department of Human Services, Division of Services
for the Blind, Appellant.
 Nos. 87-2017, 87-2078.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 13, 1988.
Decided Dec. 5, 1988.
Rehearing and Rehearing En Banc Denied Feb. 17, 1989.
 
 Jeffrica Jenkins Lee, Washington, D.C., for U.S.
 Arnold Jochums, for State of Ark.
 Melva Harmon, Little Rock, Ark., for George McNabb.
 Before LAY, Chief Judge, FAGG, Circuit Judge, and DOTY,* District Judge.
 PER CURIAM.
 
 
 1
 The United States Department of Education and the Division of Services for the Blind of the Arkansas Department of Human Services (the state) appeal from the district court's[1] grant of summary judgment in favor of George McNabb. The district court ordered the Secretary of Education to convene an arbitration panel pursuant to the Randolph-Sheppard Vending Stand Act, 20 U.S.C. Secs. 107-107f, to consider McNabb's request for compensatory relief, attorney's fees, and costs.
 
 I. BACKGROUND
 
 2
 The Randolph-Sheppard Act (the Act) created a cooperative federal-state program for the licensing, training, and placement of blind persons as operators of vending facilities on federal, state, and other properties. The Department of Education administers the Act on the federal level, and has designated the Arkansas Department of Human Services, Division of Services for the Blind, to administer the Act in Arkansas.
 
 
 3
 McNabb is a blind person licensed under the Act to operate a vending facility in Arkansas. On September 12, 1980, McNabb bid for three telephone company vending facilities. In violation of applicable laws and regulations, two of these facilities, which were more profitable than the stand McNabb then operated, were awarded to blind vendors with less seniority than McNabb.
 
 
 4
 On October 20, 1980, McNabb filed a grievance, requesting a full evidentiary hearing as provided for in 20 U.S.C. Sec. 107d-1(a).[2] On February 11, 1981, the hearing officer upheld the denial of the vending stands to McNabb.
 
 
 5
 McNabb then filed a complaint with the Department of Education, also pursuant to 20 U.S.C. Sec. 107d-1(a), requesting that an arbitration panel be convened to decide his entitlement to one of the facilities he had been denied. He later amended his complaint to request specific relief: assignment to one of the stands with damages for the period he was denied a stand, as well as attorney's fees and costs.
 
 
 6
 The arbitration hearing was held on September 8, 1983. After the hearing but before the arbitration panel issued its decision, Commissioner Conn, the Rehabilitation Services Administrator of the Department of Education, informed the parties that the Secretary of Education took the position that neither compensatory relief nor attorney's fees were contemplated under the Act and that such awards would be contrary to the principle of sovereign immunity.
 
 
 7
 On December 29, 1983, the arbitration panel issued its decision, finding that McNabb had wrongfully been denied one of the stands. As relief, the panel gave McNabb a continuing right of assignment to the first of the two stands at issue that became vacant. He was also given a continuing right of assignment to any other facility for which he submitted an application. The panel also stated that after McNabb was assigned a vending facility, he had the right to request the panel to consider awarding additional compensatory relief in the form of back pay, attorney's fees, and costs.
 
 
 8
 On October 10, 1985, McNabb accepted assignment to a new vending facility. The following month, he asked Commissioner Conn to reconvene the arbitration panel to award him additional relief. Conn refused to reconvene the panel, once again taking the position that the Act and the eleventh amendment precluded the panel from awarding compensatory relief or attorney's fees against state agencies. He later informed McNabb that his refusal to reconvene the panel constituted the final agency decision of the Secretary of Education.
 
 
 9
 McNabb sought review in federal district court of the Secretary's decision, pursuant to 20 U.S.C. Sec. 107d-2(a).[3] The district court held that arbitration panels convened pursuant to the Act have the authority to award compensatory relief and attorney's fees. Without specifically discussing the issue of whether the eleventh amendment barred such awards, the district court stated that it chose to follow the Third Circuit's decision in Delaware Dep't of Health and Social Servs., Div. for the Visually Impaired v. United States Dep't of Educ., 772 F.2d 1123 (3d Cir.1985). In Delaware, the Third Circuit, which is the only circuit court that has considered this question, held that: (1) the Act impliedly authorizes compensatory damage awards against state agencies; (2) states that choose to participate in this federally-created program for blind vendors thereby waive their eleventh amendment immunity; and (3) attorney's fees are an appropriate element of compensatory damages for breach of a contract between a blind vendor and a state agency.
 
 
 10
 Both the United States Department of Education and the Arkansas Department of Human Services appeal the district court's decision. We affirm as hereinafter modified. Judges Fagg and Doty find that the arbitration panel is not authorized to award McNabb retroactive money damages against the state. Judge Fagg would hold that the Act does not authorize any awards of money damages against the states. Judge Doty would hold that the state has not waived its eleventh amendment immunity to retroactive money damages. Chief Judge Lay and Judge Doty find that the arbitration panel is authorized to award prospective damages from the date of the panel's decision, December 29, 1983, to the date McNabb accepted assignment to a new vending facility, October 10, 1985.
 
 
 11
 The district court's order to the Secretary of Education to reconvene the arbitration panel is therefore affirmed, with the above-stated modification of the scope of the panel's authority to award damages.
 
 
 12
 LAY, Chief Judge, concurring and dissenting.
 
 
 13
 I would affirm the district court's judgment. I would hold both that the Act authorizes arbitration panels to assess compensatory damage awards against state agencies and that Congress has abrogated sovereign immunity for states which participate in the blind vendor program.
 
 
 14
 When Congress undertook in 1974 to revise and modernize the Randolph-Sheppard Act, it did so "by removing some of the major external obstacles to the growth of the blind vendor program operating thereunder, by centralizing the direction of the program, by providing for substantial uniformity in the administration of the program by the States, and by protecting the livelihood, rights, and economic interests of blind vendors." S.Rep. No. 937 to accompany S.2581, 93d Cong., 2d Sess. 3 (1974) (emphasis added). One of the means by which Congress sought to protect the rights and economic interests of blind vendors was by requiring participating states to agree to submit to arbitration of grievances raised by vendors. 20 U.S.C. Sec. 107d-1(a) (1982); see also Delaware Dep't of Health and Social Servs., Div. for the Visually Impaired v. United States Dep't of Educ., 772 F.2d 1123, 1125-31 (3d Cir.1985) (describing background and legislative history of the Act and its 1954 and 1974 amendments). By providing for arbitration of disputes between states and vendors, Congress clearly must have foreseen and approved awards of compensatory relief against states. As succinctly and persuasively stated by the Third Circuit:
 
 
 15
 When Congress in 1974 provided that states desiring to gain access to blind vendor locations in federal facilities must agree to submit to arbitration their disputes with blind vendors, the term arbitration had a well-recognized meaning. Congress was surely aware that arbitrators proceeding under the authority of the Federal Arbitration Act or under the authority of the Uniform Arbitration Act, as a matter of course awarded retrospective compensatory relief in appropriate cases. See generally, G. Wilner, Domke on Commercial Arbitration, Sec. 30.02 (rev. ed. 1984). Furthermore, awards of backpay in arbitrations under collective bargaining agreements were, by then, commonplace. See, e.g., United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).
 
 
 16
 * * *
 
 
 17
 * * *
 
 
 18
 Since contract arbitration was in 1974 a legal concept with a well-settled content, there is no ambiguity in Senator Randolph's choice of the term. Moreover there is not one iota of legislative history suggesting that, insofar as it dealt with the relief which arbitrators could award, the term was understood by any member of Congress to have any meaning other than the conventional one.
 
 
 19
 Id. at 1136. I agree, for the reasons thus stated by the Third Circuit, that Congress's intent to provide Randolph-Sheppard arbitration panels with the full range of traditional remedial powers could not be clearer.[1]
 
 
 20
 I also agree with the Third Circuit's conclusion that the eleventh amendment is not a bar to awarding compensatory relief against state agencies under the Randolph-Sheppard Act,[2] although my reasons for so concluding are somewhat different from the Third Circuit's. The Third Circuit stated that states waive their eleventh amendment immunity by applying to participate in the Randolph-Sheppard program and agreeing to submit to the grievance procedures and remedies the program requires. See id. at 1137-38; see also 20 U.S.C. Sec. 107(b) (1982) (providing that states shall apply to participate in the program and agree to certain enumerated conditions). I find, however, that this is an instance of congressional intent to abrogate the eleventh amendment immunity of those states that participate in the program, and therefore do not reach the question whether the state has waived its immunity. See Welch v. State Dep't of Highways and Pub. Transp., 483 U.S. 468, 107 S.Ct. 2941, 2946 & n. 4, 97 L.Ed.2d 389 (1987) (indicating that the question whether a state has waived its immunity is different from the question whether Congress has abrogated the states' immunity).
 
 
 21
 Simply stated, when Congress mandated in the Randolph-Sheppard Act that blind vendors submit their grievances to arbitration, it contemplated that the arbitrators would have the authority to award compensatory relief. The only parties with whom blind vendors can have disputes to submit to arbitration are states. Hence, Congress must have contemplated that states would be subject to the full remedial relief traditionally available in arbitration proceedings. I submit this legislation demonstrates clear congressional intent to abrogate sovereign immunity of the participating states. See Welch, 107 S.Ct. at 2947-48.[3]
 
 
 22
 Finally, I would hold that the question whether the arbitration panel has the authority to award attorney's fees as part of the compensatory damage is a question more properly decided in the first instance by the arbitration panel when it reconvenes. The Third Circuit's opinion in Delaware reached this question because the arbitration panel in that case had addressed the issue and exercised its discretion. We have no occasion to address the question until the matter is fully arbitrated.
 
 
 23
 FAGG, Circuit Judge, concurring and dissenting.
 
 
 24
 Congress in enacting the Randolph-Sheppard Act (the Act) has not conditioned the states' participation in the blind licensee program on their accepting responsibility for the payment of monetary relief later deemed appropriate to make a wronged licensee whole. Thus, I disagree with Chief Judge Lay that "the Act authorizes arbitration panels to assess compensatory damage awards against state agencies." Ante at 684. I also disagree with Judge Doty to the extent he joins Judge Lay in holding the Act permits an arbitration panel to award prospective damages against the states "for the time that elapses after an award until the [licensee] is actually in place." Post at 687; see also ante at 684.
 
 
 25
 Without question, states like Arkansas that choose to participate in this cooperative federal-state program have "agree[d] to submit the grievances of any blind licensee * * * to arbitration." 20 U.S.C. Sec. 107b(6). Further, Congress undoubtedly has the authority to condition involvement in the program on a state's acceptance of an exposure to monetary consequences arising from participation. See, e.g., Pennhurst State School & Hosp. v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981) (Pennhurst ). The critical question in this case is whether participating states knowingly accept that risk when they agree to "arbitration" as the mechanism for resolving grievances with dissatisfied licensees. I think not.
 
 
 26
 The type of obligation sought to be imposed on the State of Arkansas in this case is permitted only if the Act clearly informs states considering participation that if they choose to enter the program, liability for money damages may result. See id. at 16-17, 101 S.Ct. at 1539-40. In my view, the Act does not offer the states an informed choice--that is, by its terms the Act does not adequately alert states to the risk of encountering monetary consequences at the hands of an arbitration panel convened by the Secretary if they join the program.
 
 
 27
 Nowhere in the Act is there express reference to monetary remedies affecting participating states. In addition, the Act's legislative history is conspicuously silent on whether Congress intended arbitration panels to make monetary damage awards against participating states. The court and the Third Circuit nevertheless find the prerequisite disclosure in the Act's general provision for arbitration. See ante at 684; Delaware Dep't of Health & Social Servs. v. United States Dep't of Educ., 772 F.2d 1123, 1136 (3d Cir.1985) (Delaware ). Under their theory, legislation that provides for arbitration necessarily implies Congress intended to include monetary damage awards because those awards have long been legitimate weapons in an arbitrator's arsenal. In essence, the argument goes: because damages may traditionally be awarded by arbitrators, damages must be part of the package bargained for when a state elects to enter a program calling for arbitration. See Delaware, 772 F.2d at 1136-37. I disagree. A state's informed choice to accept an obligation to pay money damages cannot rest on an implied statutory authorization, see Pennhurst, 451 U.S. at 17, 25, 101 S.Ct. at 1539, 1544 and, in my view, certainly not on one as fragile as the court contends exists in this case.
 
 
 28
 I have no reason to disagree with the Delaware court's loosely couched characterizations that at the time the Act was revised to provide for arbitration, the term arbitration had a "well-recognized" meaning, and that arbitral awards of damages were "commonplace." Delaware, 772 F.2d at 1136. Nor do I have any reason to challenge Chief Judge Lay's assertion that " 'Congress was surely aware * * * arbitrators * * * as a matter of course awarded retrospective compensatory relief in appropriate cases.' " Ante at 684 (quoting Delaware, 772 F.2d at 1136). Such a description of Congress' perception may indeed be accurate, including the speculation that Congress anticipated "awards of compensatory relief [would be entered] against states." Id.
 
 
 29
 Significantly, none of these unstructured characterizations takes account of the essential litmus test for determining the remedies available against a state under the Act. They focus entirely on assumptions about Congress' unspoken understanding of the ultimate consequences of its legislative package. The Supreme Court, however, "insist[s] that Congress speak with a clear voice." Pennhurst, 451 U.S. at 17, 101 S.Ct. at 1540; see also id. ("[W]e may assume that Congress will not implicitly attempt to impose massive financial obligations on the [s]tates."). In light of the Supreme Court's insistance on articulated statutory conditions, I believe the Delaware court is skating on thin ice when it concludes the term "arbitration," standing alone, is "unambiguous." Delaware, 772 F.2d at 1137.
 
 
 30
 By authorizing money damages under the Act, the court and the Third Circuit have required states unwittingly to expose themselves to potentially sizeable financial obligations. They do so on the strength of an oblique reference to a dispute resolution mechanism that encompasses multiple remedies, including many with nonmonetary characteristics. See Committee of Blind Vendors v. District of Columbia, 695 F.Supp. 1234, 1236 (D.D.C.1988) (action seeking approximately $1,166,000 in damages). This exposure is entirely at odds with the principle that the congressional power to impose conditions on participating states rests on the indispensable requirement that its conditions are "expressly articulated." Pennhurst, 451 U.S. at 16, 101 S.Ct. at 1539. Neither Congress, nor a court interpreting the Act, is permitted to "surpris[e] participating [s]tates with postacceptance * * * conditions." Id. at 25, 101 S.Ct. at 1544.
 
 
 31
 Ironically, the Delaware court's and this court's willingness to award prospective damages, ante at 684, create a powerful incentive for states to steer clear of laudable state-federal programs for fear of incurring hidden, but nevertheless significant, financial liability. Thus, the very people the program was designed to benefit--the blind licensees--may ultimately be the losers. I would hold the Act does not authorize any awards of money damages against the states and reverse the district court.
 
 
 32
 Finally, with regard to attorney fees, the arbitration panel may determine that attorney fees should be paid by the Secretary of Education rather than by the State of Arkansas. See 20 U.S.C. Sec. 107d-2(d). If that occurs, my concerns about monetary awards against states would not be implicated. Thus, I agree with Chief Judge Lay that "the question whether the arbitration panel has the authority to award attorney's fees * * * is a question more properly decided in the first instance by the arbitration panel when it reconvenes." Ante at 685.
 
 
 33
 DOTY, District Judge, concurring and dissenting.
 
 
 34
 The issue to be decided by this court is whether the Act, as amended, authorizes an award by the arbitration panel of money damages, and the extent of those damages. When the Act is viewed against the backdrop of the eleventh amendment, it is seen that Congress only intended that the arbitration panel authorized by 20 U.S.C. Sec. 107d-1(a) have the necessarily implied powers to grant prospective relief, and did not intend to abrogate the state's rights under the Constitution. This conclusion is reached because, in enacting the Randolph-Sheppard Act, Congress did not make it unambiguous that the state's participation in the blind vendors program would result in a waiver of its sovereign immunity or condition its participation on accepting all forms of monetary relief, including retroactive damages. See Pennhurst State School & Hosp. v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981). It is clear and unambiguous that Congress meant the arbitration panel established by the Act to have the authority to grant prospective relief in the form of an award of preferential consideration for another facility. Such authority carries with it the necessary remedial power to compensate an affected vendor for the time that elapses after an award until the vendor is actually in place.
 
 
 35
 Under Sec. 107d-2(d), I believe that the vendor should also be reimbursed for any costs, including reasonable attorney's fees, made necessary by the acts of the Secretary. This holding avoids the onerous effect on a state treasury of retroactive damage awards, Edelman v. Jordan, 415 U.S. 651, 665, 668, 94 S.Ct. 1347, 1357, 1358 (1974), while effectuating the remedial provisions of the Act. I would not follow the holding of the Third Circuit in Delaware Dep't of Health & Social Servs., Div. for Visually Impaired v. United States Dep't of Educ., 772 F.2d 1123 (3d Cir.1985), as I believe the legal underpinnings of that case have been fatally eroded.
 
 
 
 *
 The HONORABLE DAVID S. DOTY, United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 The Honorable William R. Overton, United States District Judge for the Eastern District of Arkansas
 
 
 [2]
 20 U.S.C. Sec. 107d-1(a) (1982) provides:
 Any blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a State licensing agency a request for a full evidentiary hearing, which shall be provided by such agency in accordance with section 107b(6) of this title. If such blind licensee is dissatisfied with any action taken or decision rendered as a result of such hearing, he may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 107d-2 of this title, and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter.
 
 
 [3]
 20 U.S.C. Sec. 107d-2(a) (1982) provides:
 Upon receipt of a complaint filed under section 107d-1 of this title, the Secretary shall convene an ad hoc arbitration panel as provided in subsection (b) of this section. Such panel shall, in accordance with the provisions of subchapter II of chapter 5 of Title 5, give notice, conduct a hearing, and render its decision which shall be subject to appeal and review as a final agency action for purposes of chapter 7 of such Title 5.
 The statute's references to Chapters 5 and 7 of Title 5 are to the administrative procedure and judicial review provisions of the Administrative Procedure Act. The Act thus incorporates by reference 5 U.S.C. Sec. 706, which allows district courts to set aside agency actions that are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, without observance of legally-required procedures, or unsupported by substantial evidence.
 
 
 [1]
 In the Steelworkers Trilogy cases, the Supreme Court broadly defined an arbitrator's power to fashion remedies in labor dispute cases
 When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency.
 United Steelworkers of Am. v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960) (emphasis added).
 The same power is recognized to be within an arbitrator's authority in commercial arbitration cases. Totem Marine Tug & Barge, Inc. v. North Am. Towing, Inc., 607 F.2d 649, 651 (5th Cir.1979). The Commercial Arbitration Rules of the American Arbitration Association have long provided in section 42, which covers the scope of the award, that an arbitrator "may grant any remedy or relief which he deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract." Both areas of arbitration have recognized an arbitrator's traditional authority to include broad remedial power.
 
 
 [2]
 Since my view of the eleventh amendment is in the minority, for purposes of argument, I have assumed that an enforcement proceeding in federal courts of an arbitration award against the state would violate the eleventh amendment
 However, I submit this assumption is tenuous. The arbitration proceeding does not involve a suit in federal court against a state. There is no eleventh amendment issue actually before us. The issue here is whether the arbitrator can make an award involving money damages against the state in an arbitration proceeding.
 
 
 [3]
 I would thus hold that the authority of Congress to subject states to suit in federal court is not limited to those instances when Congress acts pursuant to section 5 of the fourteenth amendment. Cf. Welch, 107 S.Ct. at 2946 (assuming without deciding that congressional power is not so limited); United States v. Union Gas Co., 832 F.2d 1343 (3d Cir.1987) (Congress may abrogate eleventh amendment immunity when it acts pursuant to its commerce clause powers), cert. granted, --- U.S. ----, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988); McVey Trucking, Inc. v. Illinois (In re McVey Trucking, Inc.), 812 F.2d 311 (7th Cir.) (same, when Congress acts pursuant to Bankruptcy clause), cert. denied, --- U.S. ----, 108 S.Ct. 227, 98 L.Ed.2d 186 (1987); see generally Note, More Plenary Than Thou: A Post-Welch Compromise Theory of Congressional Power to Abrogate State Sovereign Immunity, 88 Colum.L.Rev. 1022 (1988)